# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AZMI TAKIEDINE, | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 17-4518 |
| 7-ELEVEN, INC, | : | |
| *Defendant*. | : | |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                                                                                                 JUNE 27, 2018

### INTRODUCTION

Azmi Takiedine has been a franchisee of 7-Eleven for over 40 years. He alleges that 7-Eleven has tried to make life so miserable for him that he will walk away from his franchise agreements. Even so, his stores remain open. After Mr. Takiedine brought claims for both constructive termination and breach of contract, 7-Eleven filed a motion to dismiss.

First, the Court will dismiss the claim for constructive termination because constructive termination requires that there have been actual termination and Mr. Takiedine has not in fact shuttered his stores. Second, the count for breach of contract may survive, but because Mr. Takiedine never attached his franchise agreements to his complaint, the Court cannot determine precisely which contractual terms were allegedly breached. Therefore, the Court dismisses the entire complaint, and Mr. Takiedine is granted leave to file an amended complaint and attempt to state a claim for breach of contract with the allegedly applicable agreements attached.

### BACKGROUND

The Court will first summarize what appear to be the pertinent terms of Mr. Takiedine's franchise agreements with 7-Eleven. Second, the Court recounts the ways in which 7-Eleven has

1

allegedly sought to oust Mr. Takiedine from the franchise relationship. Third, the Court describes Mr. Takiedine's claim that his case is one of many in which longstanding franchisees in the Philadelphia area have found themselves in 7-Eleven's crosshairs. Finally, the Court summarizes the procedural history of the case.

## I. Terms of the Franchise Agreement

According to the complaint, the franchise agreements contain the following provisions that are pertinent to Mr. Takiedine's claims against 7-Eleven[1]:

**Mr. Takiedine's Obligations.** Mr. Takiedine must make reasonable efforts to purchase goods from 7-Eleven's suppliers. Compl. ¶ 12. If, instead, he "does not buy from the vendors that 7-Eleven wants him to," then 7-Eleven may "increase its split of the profits," even though Mr. Takiedine "is supposed to be an independent contractor" in charge of operating his own stores. *Id.* ¶ 16.

**7-Eleven's Obligations.** 7-Eleven has several obligations common in franchise relationships. The corporate entity must pay the stores' utility bills, handle store maintenance and repair, and market the 7-Eleven brand. Compl. ¶ 12. A further duty, which complements Mr. Takiedine's obligation to buy from 7-Eleven's preferred vendors, is that 7-Eleven must "get[] the lowest prices" on goods from those vendors for its franchisees. *Id.* ¶ 17.

## II. 7-Eleven's Alleged Wrongdoing

Mr. Takiedine alleges that 7-Eleven has sought to force him out of his franchises by generally making life miserable for him. In Mr. Takiedine's telling, 7-Eleven has pursued its goal using a two-pronged attack: (1) "mak[ing] false assertions" that Mr. Takiedine has violated

---

[1] The Court notes that neither party attached a copy of the agreements to the complaint or to any briefing.

2

the franchise agreements himself, and (2) "mak[ing] the business conditions so hostile" that Mr. Takiedine will terminate the agreements.  Compl. ¶ 22.

**Suggesting That Mr. Takiedine Has Breached the Agreements.**  In August 2017, 7-Eleven informed Mr. Takiedine that he had "fail[ed] to operate his store as required."  Compl. ¶ 27.  Evidently, 7-Eleven was referring to the store's run-down storefront.  *See id.* ¶ 28.  Mr. Takiedine argues that the repairs needed to fix the storefront's unsatisfactory appearance are actually 7-Eleven's responsibility under the franchise agreement.  *Id.*

Around the same time, Mr. Takiedine alleges that a 7-Eleven representative told a worker at one of his stores that Mr.Takiedine's days as a franchisee were "numbered," *see id.* ¶ 33, and told another worker that Mr. Takiedine "would soon be concluding his tenure as a 7-Eleven franchisee," *see id.* ¶ 29.  Both statements diminished employee morale at Mr. Takiedine's stores.  *See id.* ¶ 30.

**Hostile Business Conditions.**  Mr. Takiedine alleges that 7-Eleven has tried to squeeze him out of the franchise agreements economically, in two ways.

First, 7-Eleven has forced Mr. Takiedine to purchase expensive goods from 7-Eleven's preferred corporate vendors, causing Mr. Takiedine's profits to plummet.  Compl. ¶¶ 15–17.  In this respect, Mr. Takiedine alleges that 7-Eleven is breaching its contractual obligation to "get[] the lowest prices for the [franchisee]."  *Id.* ¶ 17.

Second, Mr. Takiedine alleges the 7-Eleven has been asleep at the corporate wheel.  He accuses the company of failing to adapt its "stores, products, and marketing" to "the ever-changing market and the expectation of consumers."  *Id.* ¶ 19.  Apparently, Mr. Takiedine believes that this mismanagement violates 7-Eleven's contractual obligation to market its brand.

Despite 7-Eleven's alleged bad acts, Mr. Takiedine's stores remain open.

**III.     7-Eleven's Region-Wide Scheme: Operation Philadelphia**

Mr. Takiedine claims to be one of many franchisees that 7-Eleven hopes to chase out of business. He accuses 7-Eleven of a region-wide scheme, dubbed "Operation Philadelphia," intended to force older franchisees to terminate their franchise agreements so that 7-Eleven can enter into new agreements on more favorable terms. *See* Compl. ¶¶ 23–25.

A New Jersey district court has already heard a case ostensibly about Operation Philadelphia. *See Younes v. 7-Eleven, Inc.*, No. 13-CV-3500, 2015 WL 1268313 (D.N.J. Mar. 18, 2015). There, as here, franchisees alleged that they were "targeted" for franchise termination so that 7-Eleven "could collect windfall franchise fees from new franchisees." *Id.* at *1. The *Younes* case settled after the district court denied 7-Eleven's motion for summary judgment, and most case filings are under seal in the District of New Jersey.

**IV.     Procedural History**

Mr. Takiedine's complaint contains two counts:

First, he argues that 7-Eleven's behavior has amounted to a constructive termination of the franchise agreements, in violation of 7-Eleven's implied covenant of good faith and fair dealing.

Second, he argues that 7-Eleven has breached its contractual duties (i) to get the lowest price on wholesaler goods, (ii) to conduct repairs of the storefront, (iii) to market the 7-Eleven brand, and (iv) to treat Mr. Takiedine as an independent contractor. It appears that Mr. Takiedine believes that constructive termination would constitute a breach of contract as well.

7-Eleven has filed this motion to dismiss, which the Court grants with leave to amend.

**STANDARD OF REVIEW**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). Also, the Court must accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to the nonmoving party. *See Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or even discount reality. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## DISCUSSION

First, because constructive termination requires that there be actual termination, Mr. Takiedine has no claim for constructive termination so long as his stores remain open. Second, as to the claim for breach of contract, Mr. Takiedine never attached his franchise agreements to

his complaint, so the Court cannot evaluate which or whether contractual terms were allegedly breached. Therefore, Mr. Takiedine is granted leave to file an amended complaint and attempt to state a claim for breach of contract with the agreements attached.

I. **Mr. Takiedine cannot maintain a claim for constructive termination without actually terminating his franchise agreements.**

Constructive termination, if a viable claim, would constitute a breach of 7-Eleven's implied duty of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and in its enforcement." Restatement (Second) of Contracts § 205. In Pennsylvania, standards of good faith and fair dealing apply to franchise relationships "only in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee." *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1227 (Pa. 1981).

Here, Mr. Takiedine alleges that 7-Eleven has tried to force him to abandon his franchise by (i) telling employees that his days are "numbered," (ii) accusing him of breaching his franchise agreements, and (iii) enacting corporate policies that diminish his profits. Yet the franchise relationship has not been severed. Therefore, the viability of Mr. Takiedine's claim for constructive termination depends on the exact scope of the implied duty of good faith: does it reach situations, like this one, in which a franchisor has allegedly tried — but failed — to force a franchisee to terminate the relationship?

The Court concludes that it does not: Mr. Takiedine cannot maintain a claim for constructive termination of a franchise agreement without actually walking away from his franchises. This rule is supported by holdings of the Pennsylvania Supreme Court and comports with the weight of decisional law in the Eastern District of Pennsylvania. It is also consistent with the rules governing "constructive" severance in analogous areas of law. As an added benefit, this bright-line rule offers predictability to litigants.

*A. Decisions of the Pennsylvania Supreme Court and Eastern District of Pennsylvania support the conclusion that constructive termination requires actual termination.*

Two decisions of the Pennsylvania Supreme Court bear on whether constructive termination requires actual termination of the franchise relationship: *Atlantic Richfield Co. v. Razumic*, 390 A.2d 736 (Pa. 1978), and *Witmer v. Exxon Corp.*, 434 A.2d 1222 (Pa. 1981). In *Razumic*, the court laid down the rule that, "[i]n the context of franchise agreements, a franchisor has a duty to act in good faith and with commercial reasonableness *when terminating a franchise* for reasons not explicit in the agreement." *Razumic*, 390 A.2d at 742 (emphasis added). That holding was enough for the court to reach a disposition in *Razumic*, which concerned a straightforward case of actual termination. *Id.* Yet *Razumic* hinted, in dicta, that the duty applied to franchise dealings more generally: the franchisor had an "obligation to *deal* with its franchisees in good faith and in a commercially reasonable manner." *Id.* (emphasis added).

Soon after, *Witmer* clarified that a franchisor's duties of good faith and fair dealing "are applicable only in the context of an *attempt* on the part of the franchisor to terminate its relationship with the franchisee." *Witmer*, 434 A.2d at 1227 (emphasis added); *see also Myers v. Jani-King of Phila., Inc.*, No. 09-CV-1738, 2012 WL 6058146, at *7 (E.D. Pa. Dec. 5, 2012) (stating that *Witmer* "clarified *Razumic*'s limitations"). But this, too, was dicta. Although *Witmer* wrote in terms of "attempted" termination, this language was not necessary to the disposition of the case. *See Witmer*, 434 A.2d at 1227.

The divergence between dicta and disposition in *Witmer* and *Razumic* has led to a dilemma in Pennsylvania law: "The precise contours of the good faith duty in the franchise relationship have not been established by the Pennsylvania Supreme Court." *Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 555–56 (E.D. Pa. 2008); *see also Cottman Transmission Sys. v. McEneany*, No. 05-CV-6768, 2007 WL 210094, at *10 (E.D. Pa.

Jan. 19, 2007) ("Pennsylvania law is unsettled on the scope of the implied duty of good faith. . . . Courts are divided on how far the duty of good faith extends.").

In short, neither the Pennsylvania Supreme Court nor the Third Circuit Court of Appeals has definitively held that the duty of good faith extends beyond the context of actual franchise termination. Faced with this uncertainty, district courts in Pennsylvania have opted to play it safe: absent "clear guidance from the Supreme Court of Pennsylvania or the Court of Appeals for the Third Circuit," many decisions have declined to broaden the scope of the duty. *Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 418–19 (W.D. Pa. 2005); *see also Keshock v. Carousel Sys., Inc.*, 2005 WL 1198867, at *3 (E.D. Pa. May 17, 2005) ("Pennsylvania courts have never extended the franchisor's good faith duty beyond the context of termination. . . . Absent some indication from the Pennsylvania Supreme Court that the duty of good faith dealing should be imposed on franchisors in their pre-termination dealings with franchisees, this court cannot find that such a duty exists.").

Thus, most decisions in this district have concluded that Pennsylvania courts would limit the duty of good faith to franchise terminations. *See, e.g.*, *Coxfam, Inc. v. AAMCO Transmission, Inc.*, No. 88–6105, 1990 WL 131064 (E.D. Pa. Sept. 6, 1990) (O'Neill, J.); *Valencia v. Aloette Cosmetics, Inc.*, 1995 WL 105498, at *2 (E.D. Pa. Mar. 10, 1995) (refusing to predict that the Pennsylvania Supreme Court would expand the implied duty of good faith in franchise relationships to include situations not involving termination). One outlier from this general trend is Judge Pollack's decision in *AAMCO Transmissions, Inc. v. Harris*, 759 F. Supp. 1141 (E.D. Pa. 1991). There, the court noted that state court decisions had identified the duty of good faith "only in the context of the termination of franchise agreements," but emphasized that those courts' "discussions have not in terms limited the duty to that context." *Id.* at 1148; *see*

*also Bedrock Stone & Stuff, Inc. v. Mfrs. & Traders Trust Co.*, 2005 WL 1279148 *7 (E.D. Pa. May 25, 2005) (predicting that the Pennsylvania Supreme Court would hold that a duty of good faith and fair dealing is inherent in every contract).

Judge Pollack's opinion in *AAMCO* read a great deal into the Pennsylvania Superior Court's decision in *Creeger Brick & Bldg. Supply v. Mid-State Bank & Trust Co.*, 560 A.2d 151 (Pa. Super. Ct. 1989). In particular, it relied on dicta in *Creeger* stating that "a duty of good faith has been imposed upon franchisors in their *dealings* with franchisees." 560 A.2d at 153–54 (Pa. Super. Ct. 1989) (emphasis added). But *Creeger* "did not involve a franchise relationship; rather, the dispute there stemmed from a borrower's claim against a lending institution." *GNC Franchising LLC v. Khan*, No. 05-CV-1341, 2008 WL 612749, at *8 (W.D. Pa. Mar. 3, 2008); *see also Keshock*, 2005 WL 1198867, at *3 n.1 ("*AAMCO v. Harris*' reliance on *Creeger* may have been misplaced, as *Creeger* did not involve a franchise relationship."). One prepositional clause in one sentence of dicta in *Creeger* is too slender a reed on which to rest an expansion of a franchisor's duty of good faith.

No surprise, then, that the overwhelming weight of authority has since diverged from Judge Pollack's decision in *AAMCO*. *See Myers*, 2012 WL 6058146, at *7 (citing *AAMCO Transmissions, Inc. v. Wirth*, No. 11-CV-4250, 2011 WL 6088671, at *11 (E.D. Pa. Dec. 7, 2011); *Kahn*, 2008 WL 612749, at *7–8; *GNC Franchising, LLC, v. Farid*, No. 05-CV-1741, 2006 WL 1878925, at *4–5 (W.D. Pa. July 6, 2006); *Bishop*, 403 F. Supp. 2d at 419; *Valencia*, 1995 WL 105498, at *2); *see also Keshock*, 2005 WL 1198867, at *3; *Coxfam*, 1990 WL 131064; *cf. Gabe Staino Motors, Inc. v. Volkswagen of Am., Inc.*, No. 99-CV-5034, 2005 WL 1041196, at *12 & n.9 (E.D. Pa. Apr. 29, 2005) (noting in passing that *Razumic* addressed the obligations of "a franchisor terminating a franchisee relationship," *id.* at *12, and that the

*Razumic* standard applies "where a franchise agreement [does] not include specific provisions addressing termination," *id.* at *12 n.9) (first citing *Razumic*, 390 A.2d at 742; then citing *id.* at 742 n.8).

### B. Analogies situations of constructive severance bolster the conclusion that constructive termination requires actual termination.

In three other areas of the law, the severance of a legal relationship is not constructive until it actually occurs. First, in employment law, an employee has not been constructively discharged until the employee actually ends the employment relationship. *See Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). Second, in landlord-tenant law, a tenant has not been constructively evicted until the tenant actually abandons the property. *See Sears, Roebuck & Co. v. 69th St. Retail Mall, L.P.*, 126 A.3d 959, 973 (Pa. Super. Ct. 2015). Finally, under the framework established by the federal Petroleum Marketing Practices Act, the U.S. Supreme Court held that franchisees must actually "abandon their franchises before claiming constructive termination." *See Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 559 U.S. 175, 184 (2010).

### C. The bright-line rule that constructive termination requires actual termination offers predictability to litigants.

A rule that a mere attempted termination can give rise to a breach of good faith is not workable. Neither *Razumic* nor *Witmer* explained how such a rule would operate in practice. Thus, a litigant would have little guidance on how to decide which of a franchisor's allegedly wrongful acts were meant to force a franchisee to terminate the franchise relationship. At oral argument here, counsel for Mr. Takiedine argued that if 7-Eleven's alleged scheme in "Operation Philadelphia" did not breach the implied covenant of good faith, then nothing would. Even if correct, this contention does not change the Court's conclusion that a claim for breach of the implied covenant does not accrue *unless there has been an actual termination*. Until then, how is a litigant to know whether an aggressive tactic by a franchisor is merely a hard-nosed (but

legal) business decision, or is truly aimed at strong-arming a franchisee into terminating the franchise?

The Supreme Court has already sounded the alarm of unworkability in an analogous constructive-termination context. There, the Court rejected a call to "articulate a standard for identifying those breaches of contract that should be treated as effectively ending a franchise," even when the franchise relationship continues. *See Mac's Shell Serv.*, 559 U.S. at 187. As the Court explained, "any such standard would be indeterminate and unworkable. How is a court to determine whether a breach is serious enough effectively to end a franchise when the franchisee is still willing and able to continue its operations? And how is a franchisor to know in advance which breaches a court will later determine to have been so serious?" *Id.* Any possible standard, the Court concluded "simply evades coherent formulation." *Id.*

In sum, the Court holds that constructive termination requires actual termination of the franchise relationship. Because Mr. Takiedine's stores remain open, he has failed to state a claim for constructive termination.

## II. Mr. Takiedine is granted leave to amend his complaint to allege his claim for breach of contract with sufficient particularity.

Mr. Takiedine did not attach a franchise agreement to his complaint, much less specify which contractual terms he believes 7-Eleven has breached. Based on the complaint, the Court has sought to discern the contractual obligations that were allegedly breached:

- Obligation to perform necessary repairs at the store.

- Obligation to allow Mr. Takiedine to control the manner and means of work as an independent contractor.

- Obligation to "get[] the lowest prices" on goods from 7-Eleven's suppliers.

- Obligation to market the 7-Eleven brand.

Without reviewing the franchise agreements, the Court cannot evaluate whether Mr. Takiedine has stated a viable claim for breach of contract. Therefore, the Court dismisses the entire complaint.

Mr. Takiedine may file an amended complaint, attaching the franchise agreements and highlighting the specific terms alleged to have been breached. This step will ensure that he alleges his count for breach of contract with sufficient particularity, rather than leaving the Court to guess as to the content of his contracts.[2]

## CONCLUSION

For the foregoing reasons, 7-Eleven's motion to dismiss is granted and Mr. Takiedine is granted leave to amend his complaint consistent with this Memorandum. An appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[2] A separate reason to order an amended complaint attaching copies of the franchise agreements is the prospect of arbitration. 7-Eleven has suggested that Mr. Takiedine's allegations about 7-Eleven's contractual obligations regarding wholesale vendors are subject to mandatory arbitration. The Court would need to see the contracts to know if this contention is correct, and to see if any other terms in the agreement give rise to mandatory arbitration as well.