## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| AZMI TAKIEDINE, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| 7-ELEVEN, INC, | : | NO. 17-4518 |
| Defendant. | : | |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                    FEBRUARY 22, 2019

Azmi Takiedine has operated two 7-Eleven franchises in Pennsylvania for more than four decades. In 2004, he signed amended franchise agreements. Starting around 2011, Mr. Takiedine claims that 7-Eleven has tried to squeeze him out of the Franchise Agreements economically and has breached the Franchise Agreements in several ways. He claims that he is not the only longstanding franchisee in 7-Eleven's crosshairs and accuses 7-Eleven of a region-wide scheme, dubbed "Operation Philadelphia," intended to force older franchisees to terminate their franchise agreements so that 7-Eleven can enter into new agreements on more favorable terms. Mr. Takiedine is still a 7-Eleven franchisee.

In his original complaint, Mr. Takiedine brought claims for breach of the covenant of good faith and fair dealing and breach of contract. The Court dismissed Mr. Takiedine's original claim for breach of the covenant of good faith and fair dealing because Mr. Takiedine is still a franchisee and his constructive termination theory required, at a minimum, actual termination of the franchise relationship. The Court also dismissed his breach of contract claim but granted leave for Mr. Takiedine to file an amended complaint, instructing him to attach the Franchise Agreements and to highlight the specific terms alleged to have been breached.

Thereafter, Mr. Takiedine filed his amended complaint. He re-pleaded his breach of the covenant of good faith and fair dealing claim—this time without pleading constructive termination—and breach of contract claim, and he added new claims, including unconscionability, unjust enrichment, impracticability, conversion, and fraud. 7-Eleven filed a motion to dismiss Mr. Takiedine's amended complaint. 7-Eleven also filed a motion to stay arbitrable claims, arguing that new aspects of Mr. Takiedine's breach of contract claim concerning vendor negotiating practices must be stayed pending mandatory arbitration, as required by the Franchise Agreements. The Court held oral argument on these motions and allowed the parties to file supplemental briefing.[1]

**As discussed in Section I below**, the Court will dismiss Mr. Takiedine's breach of the covenant of good faith and fair dealing claim because—as the Court explained in its earlier opinion (Doc. No. 23)—under Pennsylvania law, the covenant of good faith and fair dealing applies in the franchise context only to the termination of a franchisee.

**In Section II**, the Court addresses Mr. Takiedine's breach of contract claim. Although Mr. Takiedine's breach of contract claim makes up only one count of the amended complaint, it can be broken down into seven separate claims of breach: **First**, the Court will dismiss Mr. Takiedine's breach of contract claims concerning (1) merchandise audits; (2) advertising expenditures; and (3) charges Mr. Takiedine must pay if he does not buy enough products from recommended vendors. **Second**, the breach of contract claims concerning (4) maintenance requests; (5) failure to treat Mr. Takiedine as an independent contractor; and (6) failure to provide Mr. Takiedine notice of increased credit card fees will survive. **Third**, the breach of contract claim concerning (7) 7-

---

[1]    The Court also held oral argument in a case brought against 7-Eleven by another franchisee involving similar claims. *See Chong et al. v. 7-Eleven, Inc.*, Civ. No. 18-1542. A separate memorandum and order will be issued in *Chong*.

Eleven's failure to secure the lowest prices for franchisees from its vendors—including the related claim that manufacturers and vendors who sell 7-Eleven's proprietary products to franchisees do not provide a return or sales credit in the event these products remain unsold—will be stayed for arbitration pursuant to the Franchise Agreements.

**Finally, in Section III,** the Court addresses the additional claims in Mr. Takiedine's amended complaint. The Court will dismiss Mr. Takiedine's claims for impracticability and unconscionability because they are not recognized causes of action under Pennsylvania law. The Court will also dismiss Mr. Takiedine's fraud claim because it does not meet the heightened pleading requirements. Finally, Mr. Takiedine's claims for unjust enrichment and conversion survive.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). However, "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to

cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"). Also, the Court must accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183–84 (3d Cir. 2000) (citations and internal quotation marks omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions") (citations omitted).

## DISCUSSION

### I. Breach of the Covenant of Good Faith and Fair Dealing

The Court dismissed Mr. Takiedine's original claim for breach of the covenant of good faith and fair dealing—which relied on a constructive termination theory—because Mr. Takiedine is still a 7-Eleven franchisee, and constructive termination requires termination of the franchise relationship. *See* June 27, 2018 Memorandum (Doc. No. 23), at 11. In Count I of his amended

4

complaint, Mr. Takiedine re-pleaded his good faith claim. Instead of relying on a constructive termination theory, Mr. Takiedine based his new good faith claim on "the fact that Defendant has imposed unreasonable and uncontemplated charges that have entirely diminished Plaintiff's profits, interfering with Plaintiff's management of his stores and otherwise cheated Plaintiff in his audits."

Mr. Takiedine's re-pleaded good faith claim, however, runs afoul of the Court's prior opinion. There, the Court explained that—under Pennsylvania law—standards of good faith and fair dealing apply to franchise relationships only in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee. *Id.* at 7–9; *see also Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 419 (W.D. Pa. 2005) ("In the absence of clear guidance from the Supreme Court of Pennsylvania or the Court of Appeals for the Third Circuit, this Court declines to extend the scope of duty [beyond termination]."); *Keshock v. Carousel Sys., Inc.*, Civ. No. 04-758, 2005 U.S. Dist. LEXIS 9660, at *7 (E.D. Pa. May 17, 2005) ("Pennsylvania courts have never extended the franchisor's good faith duty beyond the context of termination . . . .").

The two cases from another district cited by Mr. Takiedine in opposition to this limitation on good faith claims in the franchise context are not new and do not persuade the Court to reconsider its previous analysis. *See A&L Precision Prods. v. Alloy Bellows & Precision Welding, Inc.*, Civ. No. 07-345, 2009 U.S. Dist. LEXIS 83602, at *33 (W.D. Pa. Aug. 6, 2009); *GNC Franchising, Inc. v. O'Brien*, 443 F. Supp. 2d 737, 754 (W.D. Pa. June 1, 2006). Because Mr. Takiedine's good faith claim is not based on his termination—and cannot be because he remains a 7-Eleven franchisee—the Court will dismiss this claim.

## II.    Breach of Contract

In Count II of his amended complaint, Mr. Takiedine re-pleads his breach of contract claim. 7-Eleven argues that Mr. Takiedine fails to state a claim for breach of contract because he does

not identify the provisions of the Franchise Agreements allegedly breached. Likewise, he does not plead each of the elements of breach of contract as to any particular breach. 7-Eleven also filed a separate motion arguing that to the extent Mr. Takiedine's breach of contract claim touches on its vendor negotiating practices, that claim should be stayed for arbitration pursuant to the Franchise Agreements.

Although Mr. Takiedine does not cite to specific contractual provisions in his amended complaint—as the Court instructed him to do—he does provide enough information for 7-Eleven and the Court to determine which contractual provisions are supposedly at issue. Mr. Takiedine's breach of contract claim is packaged into one count in his amended complaint, but it can be broken down into seven separate claims of breach. As discussed here, the Court will dismiss three of these claims because they are insufficiently pleaded, three survive, and Mr. Takiedine's vendor negotiating practices claims—including his claims concerning 7-Eleven's proprietary products—will be stayed for arbitration.[2]

Under Pennsylvania law, a claim for breach of contract requires three elements: "(1) the existence of a contract, including its material terms, (2) breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citation omitted). Although "not every term of a contract must be stated in complete detail, every element must be specifically pleaded." *Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 658 n. 20 (E.D. Pa. Feb. 5, 2010) (quoting *CoreStates Bank, Nat'l Assn. v. Cutillo*, 732 A.2d 1053, 1058 (Pa. Super.

---

[2] In the Court's estimation, splitting the handling of the claims being pursued—with the primary bundle being addressed here on the one hand, and the one claim subject to arbitration on the other—is unfortunate for the parties in terms of efficiency or economic case management. However, even though it would be desirable for the entirety of this dispute to be resolved in a single forum, that result is not feasible in this instance, given the persistent demand for arbitration, as addressed, *infra*.

1999)).  "When allegations contained in a complaint are contradicted by the document it cites, the document controls."  *In re PDI Sec. Litig.*, Civ. No. 02-211, 2005 U.S. Dist. LEXIS 18145, at *66 (D.N.J. Aug. 17, 2005).

### A. *Mr. Takiedine's Insufficient Breach of Contract Claims*

The three claims discussed below are inconsistent with the language of the Franchise Agreements or are otherwise insufficiently pleaded.  Therefore, they will be dismissed.

#### 1. <u>Fair and Accurate Merchandise Audits</u>

Mr. Takiedine claims that 7-Eleven "has not been conducting fair and accurate merchandise audits as required by the Franchise Agreements, and wrongfully charged Plaintiff for the erroneous shortages."  The source of this claim appears to be Section 14 of the Franchise Agreements.  Section 14, titled "Audit Rights," states that 7-Eleven agrees to conduct at least one audit each calendar quarter.  However, Section 14 explicitly states that "Audits shall be binding within twenty-four (24) hours after receipt of such report unless either party gives notice that such party believes the Audit to be incorrect."

Even assuming 7-Eleven's audits were inaccurate, Mr. Takiedine does not claim that he objected to the audits within the specified period or otherwise assert how 7-Eleven's alleged unfair and inaccurate audits breached the Franchise Agreements.  Therefore, the Court will dismiss Mr. Takiedine's breach of contract claim concerning "fair and accurate merchandise audits."

#### 2. <u>Failure to Market and Advertise</u>

Mr. Takiedine next argues that 7-Eleven "failed to market and advertise as agreed."  The source of this claim appears to be Section 22 of the Franchise Agreements.  Under Section 22, Mr. Takiedine agreed to pay 7-Eleven an advertising fee.  Section 22(a)(3) states that 7-Eleven has "and will continue to have the sole and absolute right to determine how Advertising Fees will be

spent . . . and that [7-Eleven has] no fiduciary obligation to you or to other 7-Eleven franchisees with respect to such determinations or expenditures of the Advertising Fees."  Section 22(a)(4) further states that 7-Eleven undertakes "no obligation to make expenditures of Advertising Fees which are equivalent or proportionate to a franchisee's Advertising Fee payment or to ensure that any particular franchisee benefits directly or pro rata from such expenditures . . . ."  Because the contract gives 7-Eleven complete discretion over how to spend the Advertising Fees, the Court will dismiss Mr. Takiedine's claim concerning 7-Eleven's alleged failure to market and advertise as agreed.

        3.   *Recommended Vendors*

Mr. Takiedine includes two paragraphs in his breach of contract claim stating that "if Plaintiff does not buy non-proprietary products from the vendors that 7-Eleven wants him to, 7-Eleven will unilaterally increase its split of the profits."  However, Mr. Takiedine does not further explain how this constitutes a breach of the Franchise Agreements.  Rather, as 7-Eleven points out, Section 15(g) of the Franchise Agreement expressly requires Mr. Takiedine to purchase 85% of his stores' merchandise from 7-Eleven's recommended vendors, and a related provision, Section 10(b), permits 7-Eleven to increase the "7-Eleven Charge" by two percent if Mr. Takiedine does not meet the recommended vendors requirement.  Although Mr. Takiedine describes these provisions as onerous and negatively affecting his stores' profits, he does not explain anywhere in the amended complaint how 7-Eleven violated them.  Therefore, this claim will be dismissed.

### B.  Mr. Takiedine's Sufficient Breach of Contract Claims

The three claims discussed below have been sufficiently pleaded.  Therefore, the Court will not dismiss them at this stage in the litigation.

1. *Failure to Provide Necessary Maintenance*

As 7-Eleven readily admits, Mr. Takiedine's strongest claim for breach of contract involves 7-Eleven's alleged failure to provide maintenance to his stores as required by the Franchise Agreements. Specifically, Mr. Takiedine claims that his maintenance requests regarding a leaky roof and potholes in his parking lot have gone unheeded. These claims appear to arise out of Section 20(d) of the Franchise Agreements. Section 20(d) provides that "[w]hen we [7-Eleven] consider it necessary during the Term of this Agreement, we agree to . . . (4) repair the floor covering, exterior walls, roof, foundation, and parking lot . . . ."

7-Eleven argues that this claim should be dismissed because Mr. Takiedine fails to allege an essential component of the obligation claimed to have been breached: that 7-Eleven considered the sought repairs "necessary." Although Mr. Takiedine did not specifically allege that 7-Eleven considered the repairs necessary, he sufficiently pleaded this breach of contract claim. 7-Eleven was certainly on notice of the nature of the claim, and whether 7-Eleven considered these repairs necessary and whether its failure to provide the maintenance requested breached the contract can be determined at a later stage in the proceeding with the benefit of a factual record.

2. *Failure to Treat as Independent Contractor*

Mr. Takiedine also alleges that 7-Eleven "failed to treat Plaintiff as an independent contractor as set forth in the Franchise Agreements by, *inter alia*, forcing Plaintiff to sell products that he did not order and interfering with Plaintiff's management of his staff and communicating directly to Plaintiff's staff in a harmful way." Mr. Takiedine argues that this claim arises from Section 2 of the Franchise Agreements. Section 2 states that the parties "agree that this Agreement creates an arm's-length business relationship and does not create any fiduciary, special or other similar relationship." It also states that Mr. Takiedine agrees "(a) to hold [himself] out to the

public as an independent contractor; (b) to control the manner and means of the operation of the Store; and (c) to exercise complete control over and responsibility for all labor relations and the conduct of [his] agents and employees, including the day-to-day operations of the Store and all agents or Store employees." Finally, Section 2 states that 7-Eleven does "not exercise any discretion or control over [Mr. Takiedine's] employment policies or employment decisions."

7-Eleven argues that Section 2 does not require 7-Eleven to treat Mr. Takiedine as an independent contractor. Rather, it claims that Section 2 only creates obligations for Mr. Takiedine. 7- Eleven may—with evidence—prove that Section 2 does not create any contractual obligations. However, at this stage in the proceeding, without the benefit of a factual record, the Court is not prepared to interpret this provision or dismiss this claim.

3. *No Written Notice of Credit Card Fees and Credit Card Fees Have Greatly Increased*

Mr. Takiedine claims that 7-Eleven breached the Franchise Agreements because he did not receive notice of 7-Eleven's decision to impose credit card fees, as allegedly required by the Franchise Agreements, and because the fees for credit card transactions have "greatly increased." Mr. Takiedine's allegations regarding credit card fees arise from an amendment to the Franchise Agreements titled "Credit Card Amendment Stores Without Gasoline," signed by Mr. Takiedine on May 13, 2004. Section 7 of the Credit Card Amendment sets out Mr. Takiedine's obligation to pay a credit card fee and a formula for the fee's calculation. It further states that "We [7-Eleven] may change the Fee Percentage at any time in our sole discretion by giving you 30 days written notice. We are currently not charging this credit card fee to any franchisee. We will notify you if we intend to resume charging these fees."

In response, 7-Eleven argues that a different amendment to the Franchise Agreements titled "OFFF Existing Franchise Amendment to Franchise Agreement"—also signed by Mr. Takiedine

on May 13, 2014—supersedes the Credit Card Amendment. Section 4 of the OFFF Amendment states that "[w]e will not change our policy of paying for the portion of credit card fees for which you are responsible with respect to non-gasoline sales at your Store until January 1, 2005. . . . You agree that at any time after such date[] we can change such polices in any manner we determine, and we can change any of our other non-contractual policies at any time in our sole discretion." 7-Eleven argues that the OFFF Amendment controls because it contains a provision stating that it "supersede[s] any inconsistent or conflicting provisions in the Franchise Agreement," thereby alleviating it from any duty to provide notice of a change in the credit card fees. 7-Eleven also argues that Mr. Takiedine could not possibly have suffered damages from its failure to give him advanced notice of the increase in credit card fees.

However, the Credit Card Amendment also contains a provision stating that "[t]his Amendment supersedes and replaces all other agreements, if any, between you and us relating to the acceptance of credit cards at the Sore." Therefore, without a factual record, the Court declines to rule on which amendment to the Franchise Agreements is controlling, how much—if any— notice 7-Elven was obligated to provide Mr. Takiedine before implementing credit card fees, and whether 7-Eleven's alleged failure to notify Mr. Takiedine harmed him in any meaningful way.[3]

---

[3] Mr. Takiedine also claims that "the charges by Defendant against Plaintiff for credit card transactions have greatly increased over the years since the Franchise Agreements were signed, thereby diminishing Plaintiff's profits." However, Mr. Takiedine does not claim or otherwise suggest that the credit card fees were calculated contrary to the formula provided in the Credit Card Amendment, exceeded the fees charged by the credit card companies, or otherwise breached the Franchise Agreements. Therefore, Mr. Takiedine will not be able to pursue any claims concerning the amount of the credit card fees charged. Rather, the credit card fee claim will be limited to 7-Eleven's alleged failure to provide Mr. Takiedine with the required notice. The significance of such a failure remains to be seen.

### C. Vendor Negotiating Practices and 7-Eleven's Motion to Stay Arbitrable Claims

Finally, Mr. Takiedine claims that 7-Eleven is obligated to "make every commercially reasonable effort to obtain the lowest cost for products and services available," but "[d]espite the terms of the agreement, which state otherwise, 7-Eleven, Inc. is not getting the lowest price for the Plaintiff." Relatedly, Mr. Takiedine claims that 7-Eleven requires him to purchase and carry certain proprietary products in his stores, including "7-Select" products, and that—unlike with national brand name foods—he is not entitled to a return or sales credit in the event these proprietary products go unsold. Instead, he must take a loss in the form of a less advantageous write-off.

7-Eleven, in turn, argues that these claims arise from 7-Eleven's vendor negotiating obligations set out in Section 15(j) of the Franchise Agreements, and that Section 15(k) requires disputes arising out of or related to Section 15(j) be resolved in binding arbitration. In response, Mr. Takiedine argues that 7-Eleven has waived its right to arbitration and that, in the alternative, his claims concerning 7-Eleven's proprietary products are not within the scope of the arbitration provision.

The Federal Arbitration Act requires courts to "rigorously enforce" arbitration agreements. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Under the FAA and Pennsylvania law, "a district court must compel arbitration if it finds (1) that a valid arbitration agreement exists between the parties, and (2) that the dispute before it falls within the scope of this agreement." *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 328 (E.D. Pa. Oct. 20, 2004) (citing *McAlister v. Sentry Ins. Co.*, 958 F.2d 550, 553 (3d Cir. 1992)). Mr. Takiedine does not challenge the validity of the arbitration provision in the Franchise Agreements. Therefore, the Court need only determine whether 7-Eleven waived its right to demand arbitration and whether Mr. Takiedine's claims

concerning proprietary products fall within the scope of the arbitration provision.  Because the Court finds that 7-Eleven did not waive its right to arbitration and that Mr. Takiedine's proprietary products claims fall within the scope of the arbitration provision, the Court will stay these claims to allow the parties to promptly pursue arbitration.[4]

    1.   *7-Eleven Has Not Waived Its Right to Arbitration*

"Consistent with the strong preference for arbitration in federal courts, waiver is not to be lightly inferred, and waiver will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery."  *Paine Webber Inc. v. Faragalli*, 61 F.3d 1063, 1068–69 (3d Cir. 1995).  To determine whether a party has waived its right to arbitrate, courts in this circuit consider six nonexclusive factors:  (a) "the timeliness or lack thereof of a motion to arbitrate"; (b) "the degree to which the party seeking to compel arbitration has contested the merits of its opponent's claims"; (c) "whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings"; (d) "the extent of its non-merits motion practice"; (e) "its assent to the district court's pretrial orders"; and (f) "the extent to which both parties have engaged in discovery."  *Nino v. Jewelry Exchange Inc.*, 609 F.3d 191, 208–09 (3d Cir. 2010) (citation omitted).  "[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation conduct."  *Id.* at 209 (citation omitted).  Here, the factors ultimately favor 7-Eleven's argument.

---

[4]    To allow for the efficient and economical resolution of the entire dispute between the parties, they may still sensibly and jointly waive arbitration and allow all the issues to be resolved in this litigation.

*a) 7-Eleven's Motion to Stay the Arbitrable Claims Was Timely*

Mr. Takiedine's original complaint was filed on October 11, 2017. He argues, therefore, that 7-Eleven's motion to stay arbitrable claims, filed on August 14, 2018, was ten months delayed. This argument is unpersuasive. Although Mr. Takiedine alluded to the fact that 7-Eleven was not getting the lowest prices for its recommended products in his original complaint, none of the claims in that original complaint referenced 7-Eleven's alleged failure to secure the lowest prices for its franchisees or Mr. Takiedine's inability to return unsold proprietary products.

Only when Mr. Takiedine filed his amended complaint on July 16, 2018, did he include an expanded breach of contract allegation. Shortly thereafter, 7-Eleven's counsel began discussing arbitration with Mr. Takiedine's counsel. However, before 7-Eleven filed its motion to dismiss Mr. Takiedine's amended complaint, those arbitration negotiations fell through. Although 7-Eleven did not file its motion to stay arbitrable claims at the same time it filed its motion to dismiss the amended complaint, it filed its motion to stay two days later on August 14, 2018, approximately one month after Mr. Takiedine filed his amended complaint. One month is not an undue delay. *See Nationwide Mut. Fire Ins. Co. v. Geo V. Hamilton, Inc.*, Civ. No. 08-646, 2010 U.S. Dist. LEXIS 35114, at *13–14 (W.D. Pa. Apr. 9, 2010), *aff'd*, 410 F. App'x 537 (holding that a party did not unduly delay in seeking arbitration when it sought to compel arbitration within two months of having arbitrable claims asserted against it).

*b) 7- Eleven Has Not Meaningfully Contested the Merits of the Arbitrable Claims in the Lawsuit*

Although 7-Eleven filed a motion to dismiss the amended complaint, it stated that Mr. Takiedine's vendor negotiating practices claims are "not under consideration in this motion because they are to be resolved exclusively by arbitration." To date, 7-Eleven's only reference to the dismissal of the allegedly arbitrable claims on the merits can be found in a footnote in its

supplemental briefing. It states that "[a] practical alternative to ruling on 7-Eleven's Motions to Stay is to dismiss Plaintiffs' 'lowest price' claims." The Court finds that 7-Eleven has not meaningfully contested the merits of the allegedly arbitrable claims in the litigation.

### c) 7-Eleven Advised Mr. Takiedine that It Intended to Require Arbitration

As discussed above, the record shows that 7-Eleven advised Mr. Takiedine of its intention to seek arbitration before it formally filed its motion to stay the allegedly arbitrable claims, and the parties engaged in negotiations on this issue.

### d) 7-Eleven Has Not Filed Any Non-Merits Motions Concerning the Arbitrable Claims

7-Eleven has not filed any non-merits motions concerning the allegedly arbitrable claims.

### e) 7-Eleven Has Assented to Pre-Trial Orders but Has Always Maintained Its Right to Arbitrate

Although 7-Eleven has respected the Court's pretrial orders, including discovery orders relating to the allegedly arbitrable claims, 7-Eleven has always maintained its position that the vendor negotiating practices claims—including those concerning 7-Eleven's proprietary products—are subject to arbitration.

### f) Although Extensive Discovery Has Occurred, Mr. Takiedine Has Not Been Prejudiced

Finally, Mr. Takiedine argues that 7-Eleven has waived its right to arbitration because extensive discovery has already taken place. However, at the time 7-Eleven filed its motion to stay, little discovery related to the allegedly arbitrable claims had taken place. Discovery related to non-arbitrable claims is not problematic. *Id.* at *21–22 ("No waiver of the right to arbitrate can occur from conducting discovery on non-arbitrable claims.") (citations omitted).

Although the parties engaged in some discovery relating to the allegedly arbitrable claims before the motion to stay was filed, 7-Eleven continued to raise and maintain its right to arbitration.

For example, at the deposition of Mr. Takiedine, before asking Mr. Takiedine questions concerning potential vendor negotiating practices claims, 7-Eleven's counsel stated that the questioning was subject to "7-Eleven's objection that these claims belong in arbitration." Mr. Takiedine's counsel then responded "[r]ight, fine, you're not waiving your right." Because any discovery conducted on these issues prior to the filing of 7-Eleven's motion to arbitrate was done with the mutual understanding that 7-Eleven was not waiving its right to arbitrate, Mr. Takiedine cannot now argue that he was prejudiced.

Moreover, most of the discovery on these issues has been pursued *by Mr. Takiedine himself*. 7-Eleven reluctantly agreed to provide discovery materials related to these claims after Mr. Takiedine filed several motions to compel and the Court ordered it. Mr. Takiedine will not be prejudiced in arbitration by having acquired discovery materials that he relentlessly pursued.

For these reasons, the Court finds that 7-Eleven did not waive its right to arbitration.

### 2. *The Court Will Determine Which Claims Are Arbitrable*

7-Eleven's counsel originally admitted during oral argument that "the scope of the obligation to arbitrate is determined by the Court." However, in its supplemental briefing, 7-Eleven now argues that the scope of arbitration should be decided by an arbitrator, not the Court. 7-Eleven cites a recent decision by the Supreme Court for this proposition: *Henry Schein, Inc. v. Archer & White Sales, Inc.*, Civ. No. 17-1272, slip op. (Jan. 9, 2019).

However, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *IBEW v. Democratic Nat'l Comm.*, Civ. No. 17-1703, 2018 U.S. Dist. LEXIS 8624, at *13 (E.D. Pa. Jan. 19, 2018) (quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 648 (1986)). In the recent *Henry Schein* opinion, the Supreme Court re-affirmed this rule. Civ. No. 17-1272, slip op.

(Jan. 9, 2019), at 6 ("[P]arties may delegate threshold arbitrability questions to the arbitrator, **so long as** the parties' agreement does so by 'clear and unmistakable' evidence.") (citation omitted) (emphasis added).

The agreement at issue in *Henry Schein* stated that arbitration would be conducted "in accordance with the arbitration rules of the American Arbitration Association." *Id.* at 2. The AAA's rules, in turn, provided that the arbitrator has the power to resolve arbitrability questions. 7-Eleven argues that *Henry Schein* requires the Court to refer the arbitrability question here to an arbitrator because, like in *Henry Schein*, the arbitration provision in the Franchise Agreements states that the arbitration is to be conducted pursuant to the "commercial arbitration rules of the American Arbitration Association." However, the *Henry Schein* Court "expressed no view about whether the contract at issue in [that] case in fact delegated the arbitrability question to an arbitrator"; rather, it remanded the case so the court of appeals could decide that issue in the first instance. *Id.* at 8. Thus, *Henry Schein* does not go as far as 7-Eleven seeks to apply it.

The Third Circuit Court of Appeals has observed—without deciding—that the majority of circuits to have considered the issue have "determined that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763 (3d Cir. 2016) (citations omitted). However, "this apparent consensus among the circuits is not as clear as it seems" because "nearly every circuit to have addressed the issue, save the Eighth Circuit in *Fallo v. High-Tech Institute*, 559 F.3d 874 (8th Cir. 2009), addressed the question in the context of arbitration agreements entered into by organizations, not unsophisticated individuals." *Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 427 (E.D. Pa. Mar. 21, 2016) (citing cases). Recognizing this important distinction, a number of district courts in this circuit and elsewhere have concluded

"that a cross-reference to a set of arbitration rules containing a provision that vests an arbitrator with the authority to determine his or her own jurisdiction does not automatically constitute clear and unmistakable evidence that the parties intended to arbitrate threshold questions of arbitrability—at least where those parties are unsophisticated." *Id.* at 428.

As the *Allstate* court explained "incorporating forty pages of arbitration rules into an arbitration clause is tantamount to inserting boilerplate inside of boilerplate, and to conclude that a single provision contained in those rules amounts to clear and unmistakable evidence of an unsophisticated party's intent would be to take 'a good joke too far.'" *Id.* at 429 (citation omitted); *see also Richardson v. Coverall N. Am., Inc.*, Civ. No. 18-532, 2018 U.S. Dist. LEXIS 167240, at *10–11 (D.N.J. Sept. 27, 2018) (holding that a cross-reference to the AAA rules in a franchise agreement was not clear and unmistakable evidence that the parties delegated the issue of arbitrability to the arbitrator); *Meadows v. Dickey's Barbecue Rests., Inc.*, 144 F. Supp. 3d 1069, 1078–79 (N.D. Cal. Nov. 12, 2015) (finding no clear and unmistakable evidence that franchisees intended an arbitrator to decide questions of arbitrability even though the AAA rules were incorporated in the arbitration provision because the franchisees were "far less sophisticated" than the franchisor-defendant).

7-Eleven cannot dispute that it is more sophisticated than Mr. Takiedine, an individual franchisee. There is certainly no reason to have any confidence that these parties actually addressed the question of arbitrability. To paraphrase Chief Justice John Marshall, the power to decide who decides may well be the power to guarantee continued existence of a profit-making enterprise. *See McCulloch v. Maryland*, 17 U.S. 316, 431 (1819). At a minimum, the Court would look for some reason other than the AAA's own interest in expanding its own powers and time-logging activity before abdicating the responsibility for such a fundamental judicial function. In

this context, the Court finds that the arbitration provision's reference to the AAA rules is not clear and unmistakable evidence of the parties' intent to delegate the arbitrability issue to an arbitrator. Thus, the Court itself will determine which of Mr. Takiedine's claims fall under the arbitration provision.

3. _Mr. Takiedine's Vendor Negotiating Practices Claims—Including those Concerning 7-Eleven's Proprietary Products—Fall Within the Scope of the Arbitration Provision_

At the present time, the scope of an arbitration agreement should be decided "with a healthy regard for the federal policy favoring arbitration," and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also AT&T Techs.*, 475 U.S. at 650. When arbitration clauses include terms such as "relating to," "arising from," or "arising out of," they are normally given broad construction. *See Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000).

Section 15(j) of the Franchise Agreements states that "in negotiating our contracts with Recommended Vendors and manufacturers (in either case 'Vendor') for products and services sold in 7-Eleven Stores, [7-Eleven] will take the following steps[,]" including to "make commercially reasonable effort to obtain the lowest cost for products and services available from such Vendor to 7-Eleven Stores on a Market Basis by identifying all available discounts, allowances and other opportunities for price adjustments."   Section 15(k) states that "the dispute resolution procedures set forth in Exhibit J are the exclusive procedures for resolving any disputes relating to or arising from our undertaking under Paragraph 15(j)(1) and (2)."

In turn, the "Dispute Resolution Procedures" set out in Exhibit J to the Franchise Agreements state that:

**"ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO OUR OBLIGATIONS UNDER PARGRAPHS 15(j) AND (k) OR THE REVIEW CONDUCTED UNDER THIS EXHIBIT J WILL BE BARRED UNLESS AN**

**ACTION IS COMMENCED UNDER THESE DISPUTE RESOLUTION PROCEDURES . . . .**"

Exhibit J further states that any claims arising from these paragraphs shall be submitted to non-binding, mandatory mediation. If the non-binding mediation fails—as it did here—the claims shall be submitted to binding arbitration.

This arbitration provision clearly covers Mr. Takiedine's claim that 7-Eleven failed to "make a commercially reasonably effort to obtain the lowest cost for products and services," as the "commercially reasonable efforts" language comes straight out of Section 15(j). But Mr. Takiedine also raises a related claim: that 7-Eleven requires him to purchase and carry certain proprietary products in his stores, including "7-Select" products, and that Mr. Takiedine is not permitted to return these products in the event they go unsold. Consequently, if the required merchandise goes unsold, Mr. Takiedine alleges he must take a loss in the form of a write-off.

7-Eleven argues that Mr. Takiedine's proprietary products claim is a "vendor negotiating practices" issue and should be arbitrated. Looked at with a neutral eye, Section 15(j)(1)(i) encompasses 7-Eleven's obligation to obtain any "discounts, allowance, or other opportunities for price adjustments" with 7-Eleven's "Vendors." Mr. Takiedine's proprietary products claim can be boiled down to this: he cannot return 7-Eleven's proprietary products to the vendors or manufactures when the products remain unsold like he can with other products, and he instead must take a loss. This is, in the final analysis, a vendor negotiating practices issue, as Mr. Takiedine is contending that return rights should exist—i.e., should have been negotiated by 7-Eleven with the vendors and manufacturers of the products at issue.

Mr. Takiedine attempts to avoid the arbitration provision in several ways. He first argues that "Vendors" as defined in Section 15(j)(1) does not include the various manufactures that 7-Eleven uses to produce its own proprietary product lines. Rather, he claims that the term "Vendor"

only encompasses third-party recommended vendors with whom 7-Eleven deals at "arms-length." However, this argument is foreclosed by the language of Section 15(j)(1). Section 15(j)(1) states that "[i]n negotiating our contracts with Recommended Vendors **and manufacturers (in either case "Vendor")** for products and services sold in 7-Eleven Stores, [7-Eleven] will take the following steps . . . ." (emphasis added). "Vendor" is explicitly defined to include manufacturers other than "Recommended Vendors." Moreover, the provision references "products and services sold in 7-Eleven Stores" without excluding its own proprietary products. Given the breadth of the arbitration clause, which encompasses not only issues expressly mentioned, but also disputes "arising from or relating to" those identified issues, Mr. Takiedine's claims concerning 7-Eleven's proprietary products will also be submitted to arbitration. *Miron*, 342 F. Supp. 2d at 329 ("To overcome [the presumption of arbitrability] as applied to broad arbitration agreements, a party must either establish the existence of an express provision excluding the grievance from arbitration or provide the most forceful evidence of a purpose to exclude the claim from arbitration.") (citations omitted).

Mr. Takiedine next argues that the arbitration provision should not encompass claims concerning the "7-Select" proprietary product line because "7-Select" did not exist when Mr. Takiedine signed the Franchise Agreements. However, Mr. Takiedine admits in his amended complaint that "[u]nder the terms of the Franchise Agreements, [7-Eleven] reserved the right to add or remove proprietary products to the list of proprietary products that [Mr. Takiedine] must sell in the store." In light of this fact, and the fact that Section 15(j)(1) purports to generally cover all "products and services sold in 7-Eleven stores," Mr. Takiedine cannot now argue that claims concerning "7-Select" or other new proprietary products should be excluded from arbitration.

Finally, Mr. Takiedine argues that his claims concerning proprietary products arise from Section 15(b) of the Franchise Agreements, not Section 15(j), and thus, they should not be sent to arbitration. Section 15(b) states that Mr. Takiedine agrees to "carry at the Store all Categories of Inventory that we [7-Eleven] specify." It further provides that Mr. Takiedine "may delete any Category if such Category does not meet sales goals that we [7-Eleven] establish, provided that you [Mr. Takiedine] obtain our prior written consent, which consent will not be unreasonably withheld." However, this provision is not referenced anywhere in Mr. Takiedine's amended complaint, and he does not allege that he asked 7-Eleven for permission to stop selling any products or that 7-Eleven unreasonably rejected such a request. Mr. Takiedine cannot now re-cast his claim in an obvious effort to avoid arbitration.

For these reasons, the Court will stay Mr. Takiedine's vendor negotiating practices claims—including his claim concerning 7-Eleven's proprietary products—pending the resolution by arbitration pursuant to Sections 15(j), 15(k), and Exhibit J to the Franchise Agreements.[5]

## III.    Mr. Takiedine's Additional Claims

### A. *Unconscionability and Impracticability*

In Count III of his Amended Complaint, Mr. Takiedine brings a claim for unconscionability.[6]    He alleges that portions of the Franchise Agreements are procedurally

---

[5]      In its motion to stay, 7-Eleven notes that it "seeks a stay only of those portions of [Mr. Takiedine's] claims that concern vendor negotiating practices." Moreover, the Court has discretion to allow non-arbitrable claims to proceed despite staying arbitrable claims when there is not a "substantial overlap" between the claims. *See e.g. Oliver v. Norstrom King of Prussia*, Civ. No. 10-5340, 2010 U.S. Dist. LEXIS 132124, at *17 (E.D. Pa. Dec. 14, 2010). Therefore, the remainder of this case will proceed ahead of or simultaneously with the arbitration of the vendor negotiating practices claims.

[6]      In addition to arguing that Mr. Takiedine's new claims should be dismissed on the merits, 7-Eleven argues that Mr. Takiedine improperly added them to his amended complaint because the Court only gave leave for Mr. Takiedine to re-plead his breach of contract claim. However, as Mr. Takiedine points out, the Court instructed him that he could include additional causes of action "to

unconscionable because he lacked a meaningful choice in accepting the provisions. He also alleges that portions of the Franchise Agreements are substantively unconscionable because they unreasonably favor 7-Eleven by maximizing its profits while causing Mr. Takiedine's net profits to dwindle.

Similarly, in Count V of his amended complaint, Mr. Takiedine brings a claim for "Impracticability of Contract Provisions." He claims that at the time the Franchise Agreements were signed in 2004, he did not contemplate that the list of 7-Eleven proprietary products he would be required to sell would grow to such a large number. He further claims that 7-Eleven has required him to pay ever-increasing charges for maintenance and credit card transactions. These facts, Mr. Takiedine argues, frustrate the purpose of the Franchise Agreements, and he claims that he is entitled to damages and equitable relief.

However, under Pennsylvania law, unconscionability "is a 'defensive contractual remedy which serves to relieve a party from an unfair contract or from an unfair portion of a contract.'" *Harris v. Green Tree Fin. Corp*, 183 F.3d 173 (3d Cir. 1999) (quoting *Germantown Mfg. Co. v. Rawlinson*, 341 Pa. Super. 42, 55 (Pa. Super. 1985)). Pennsylvania law does not recognize a claim for unconscionability. *See Andrichyn v. TD Bank, N.A.*, 93 F. Supp. 3d 375, 389 (E.D. Pa. Mar. 19, 2015) ("As there is no precedent in . . . Pennsylvania allowing for an affirmative

---

the extent the rules of civil procedure allow." Fed. R. Civ. P. 15(a) states that a court "should freely give leave [to amend] when justice so requires." In this circuit, a court may deny leave to amend a complaint only where "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (citation omitted). There is no evidence of undue delay or bad faith on the part of Mr. Takiedine. Moreover, because Mr. Takiedine submitted himself to a second deposition and responded to interrogatories concerning his additional claims, 7-Eleven has not been prejudiced. Finally, as discussed below, at least some of these new claims will survive the motion to dismiss; therefore, the amendment was not futile. For these reasons, the Court will not dismiss the additional claims on this ground.

unconscionability claim, this claim must be dismissed."). Similarly, Pennsylvania law does not recognize a claim for impracticability. *See Angino v. BB&T Bank*, Civ. No. 15-2105, 2016 U.S. Dist. LEXIS 74801, at *30–31 (M.D. Pa. June 7, 2016) ("[T]hese types of affirmative defenses [including impracticability] under Pennsylvania law do not constitute an independent, free-standing legal claim.").

Mr. Takiedine does not cite—and the Court cannot find—any Pennsylvania cases allowing these types of claims to go forward. Rather, the cases cited by Mr. Takiedine addressed unconscionability and impracticability in a defensive posture. *See Salley v. Option One Mortg. Corp.*, 592 Pa. 323, 331–32 (2007) (where the plaintiff argued that it could proceed in federal court because the arbitration agreement invoked by the defendant was unconscionable); *Step Plan Servs. v. Koresko*, 12 A.3d 401, 409 (Pa. Super. 2010) (where a party to a settlement agreement argued that it should not be required to perform due to impracticability, among other reasons); *Metalized Ceramics for Elecs., Inc. v. Natl Ammonia Co.*, 663 A.2d 762, 764 (Pa. Super. 1995) (where the plaintiff argued that a provision of the contract used by the defendant to defeat the plaintiff's breach of contract claim was unconscionable). In other words, they are to serve as shields, not swords.

For these reasons, the Court will dismiss Mr. Takiedine's unconscionability and impracticability claims.

### B. Unjust Enrichment

In Count IV of his amended complaint, Mr. Takiedine brings a claim for unjust enrichment. He alleges that despite paying advertising and maintenance charges to 7-Eleven on a regular basis, he has not received the benefits from such payments. 7-Eleven, in turn, argues that Mr. Takiedine's claim for unjust enrichment should be dismissed because the subject matter of this claim is

governed by the Franchise Agreements. The Court will not dismiss Mr. Takiedine's unjust enrichment claim at this time.

Under Pennsylvania law, to state a claim for unjust enrichment, "the plaintiff must allege 'benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of value.'" *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, at 527 (E.D. Pa. Jan. 27, 2012) (quoting *Allegheny Gen. Hosp. v. Philip Morris*, 228 F.3d 429, 447 (3d. Cir. 2000)). Unjust enrichment is a "quasi-contractual doctrine that does not apply in cases where the parties have a written or express contract." *Id.* (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987)). Nevertheless, this Court has previously held that a "party may plead alternative theories of breach of contract and unjust enrichment when there is a dispute about the existence or validity of the contract in question." *Power Restoration Int'l, Inc. v. Pepsico, Inc.*, Civ. No. 12-1922, 2013 U.S. Dist. LEXIS 148016, at *20 (E.D. Pa. Oct. 11, 2013) (citations omitted).

In this case, although Mr. Takiedine admits that there is an express agreement between the parties, he also claims that portions of the Franchise Agreements are unconscionable and impracticable. Thus, at this stage of the proceeding, it is unclear whether Mr. Takiedine will pursue his breach of contract claim or challenge the validity of the Franchise Agreements and pursue his unjust enrichment claim. Accordingly, the Court will deny 7-Eleven's motion to dismiss the claim for unjust enrichment. *See id.* at *20 (declining to dismiss an unjust enrichment claim at the motion to dismiss stage despite the existence of an agreement between the parties because it was unclear

whether there would be a dispute as to the validity of the agreement). 7-Eleven may re-raise these arguments at a later stage in the proceeding, if appropriate.

## C. Conversion

In Count VI of his amended complaint, Mr. Takiedine brings a conversion claim. He alleges that 7-Eleven has implemented a new accounting method, resulting in a decrease in his reported net profits, without apparent reason in some situations. He also claims that 7-Eleven has conducted inaccurate audits of his merchandise and wrongfully charged him for false shortfalls, depriving him of his full net profit without his consent. 7-Eleven argues that the conversion claim is barred by the gist of the action doctrine. The Court will not dismiss Mr. Takiedine's conversion claim at this time.

The gist of the action doctrine "precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *Jones v. ABN AMRO Mortg. Group. Inc.*, 606 F.3d 119, 123 (3d Cir. 2010) (citation omitted). It forecloses tort claims: "1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; and 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 486 (Pa. Super. 2007) (citation omitted).

However, at the motion to dismiss stage, "a court should be slow to dismiss claims under the gist of the action doctrine" because "[f]ederal civil procedure allows parties to plead multiple claims as alternative theories of liability." *Orthovita, Inc. v. Erbe*, Civ. No. 07-2395, 2008 U.S. Dist. LEXIS 11088, at *12 (E.D. Pa. Feb. 14, 2008) (citation omitted). "Caution must be exercised in dismissing a tort action on a motion to dismiss because whether tort and contract claims are

separate and distinct can be a factually intensive inquiry." *Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.*, Civ. No. 11-4568, 2011 U.S. Dist. LEXIS 139980, at *22 (Dec. 6, 2011) (citations omitted); *see also Berger v. Montague v. Scott & Scott*, 153 F. Supp. 2d 750, 754 (E.D. Pa. 2001) (rejecting a challenge under the gist of the action doctrine and allowing a plaintiff to pursue claims for both breach of contract and conversion).

Under Pennsylvania law, conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Premier Payments Online, Inc. v. Payment Sys. Worldwide,* 848 F. Supp. 2d 513, 529 (E.D. Pa. 2012) (citations omitted).  Courts have dismissed conversion claims under the gist of the action doctrine "where the alleged entitlement to the chattel arises solely from the contract between the parties." *Premier Payments Online, Inc.*, 848 F. Supp. 2d at 529 (citation omitted). However, "when a plaintiff has a property interest in the thing that is the subject of a conversion claim, the gist of the action doctrine does not bar recovery under a conversion theory even though the property may also be the subject of a contract." *Id.* (citations omitted).

Here, Mr. Takiedine's conversion claim is based on the fact that 7-Eleven has changed its accounting method, resulting in a decrease in his profits, and that 7-Eleven has conducted inaccurate audits of his merchandise and wrongfully charged him for false shortfalls.  Although it is likely that Mr. Takiedine's claims arise solely from the contract between the parties, the Court declines to determine whether the gist of the action doctrine bars his conversion claim at this time. Accordingly, like with the unjust enrichment claim, the Court will deny 7-Eleven's motion to dismiss Mr. Takiedine's conversion claim.  *See Kimberton*, 2011 U.S. Dist. LEXIS 139980 at *22– 24.

### D. Fraud

Finally, in Count VII, Mr. Takiedine brings a claim for fraud. The fraud claim is also based on 7-Eleven's new accounting method, and Mr. Takiedine uses the same exact language as employed in his conversion claim. Mr. Takiedine does, however, add one additional paragraph stating that "the erroneous accounting and inventory reports by Defendant to Plaintiff constitute misrepresentations upon which Plaintiff has justifiably relied and caused Plaintiff to incur economic damages as a result." 7-Eleven argues that Mr. Takiedine failed to plead the fraud claim with particularity as required by Fed. R. Civ. P. 9(b). For the reasons discussed herein, the Court agrees.

To plead fraud under Pennsylvania law, a plaintiff must allege: "(1) a representation which is (2) material to the transaction at hand, (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false, and (4) made with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance." *Shuker v. Smith & Nephew*, 885 F.3d 760, 778 (3d Cir. 2018) (citation omitted). "[T]hough 'intent . . . and other conditions of a person's mind may be alleged generally,' plaintiffs 'must state with particularity the circumstances constituting fraud.'" *Id.* (quoting Fed. R. Civ. P. 9(b)). To comply with Rule 9(b), a plaintiff "must allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation and must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it was charged." *Id.* (citations omitted).

Mr. Takiedine's amended complaint falls short of this standard. First, although he conclusively states that "the erroneous accounting and inventory reports by Defendant to Plaintiff

constitute misrepresentations upon which Plaintiff has justifiably relied," he fails to identify the alleged "misrepresentations" made by 7-Eleven with any particularity. Mr. Takiedine does not state which accounting and inventory reports were erroneous or what portions of these reports were fraudulent. Second, he fails to allege that these general misrepresentations were "material to the transaction at hand." Third, he does not allege that the erroneous reports were knowingly false or prepared recklessly without knowledge of their falsity. And finally, although intent may be averred generally, Mr. Takiedine does not allege any intent by 7-Eleven to defraud him whatsoever.

For these reasons, the Court will dismiss Mr. Takiedine's fraud claim.

## CONCLUSION

For the foregoing reasons, 7-Eleven's motion to dismiss is granted in part and denied in part, and 7-Eleven's motion to stay arbitrable claims is granted. An appropriate order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE