IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AZMI TAKIEDINE, *Plaintiff* | : : : | CIVIL ACTION |
| v. | : : | |
| 7-ELEVEN, INC, *Defendant* | : : : : | NO. 17-4518 |

## MEMORANDUM

PRATTER, J.　　　　　　　　　　　　　　　　　　　　　　　　　　　MARCH 5, 2020

7-Eleven franchisee Azmi Takiedine claims that 7-Eleven breached its duties under its Franchise Agreements by failing to treat him as an independent contractor and failing to provide necessary maintenance for his stores. 7-Eleven moves for summary judgment on all claims.

For the reasons that follow, the Court grants 7-Eleven's motion for summary judgment in all respects.[1]

### BACKGROUND AND PROCEDURAL HISTORY

Mr. Takiedine has operated two 7-Eleven franchises in Pennsylvania for more than four decades. He claims that throughout his time as a franchisee, 7-Eleven failed to treat him as an independent contractor as required under the Franchise Agreements. Mr. Takiedine alleges that 7-Eleven forced him to stock and sell certain products and that 7-Eleven employees interfered with his employees by pressuring them into doing what 7-Eleven wanted, presumably contrary to Mr. Takiedine's interests and instructions. Mr. Takiedine also claims that 7-Eleven failed to provide

---

[1] The Court very recently issued a separate memorandum and order granting summary judgment in a case brought against 7-Eleven by another franchisee involving similar claims. *See Chong et al. v. 7-Eleven, Inc.*, No. 18-1542.

1

the necessary maintenance as required in the Franchise Agreements when it ignored repeated requests for repairs at his stores.

Originally, Mr. Takiedine brought claims for breach of the covenant of good faith and fair dealing and breach of contract, which the Court dismissed with leave to amend. In his amended complaint, Mr. Takiedine pleaded claims for breach of the covenant of good faith and fair dealing, breach of contract, unconscionability, unjust enrichment, impracticability, conversion, and fraud. 7-Eleven moved to dismiss and also filed a motion to stay arbitrable claims, arguing that certain aspects of Mr. Takiedine's breach of contract claims concerning vendor negotiating practices should be stayed for arbitration as required by the Franchise Agreements.

Following oral argument, the Court granted 7-Eleven's motion to stay the vendor negotiating practices claims pending arbitration as to those limited claims. It also dismissed Mr. Takiedine's breach of the covenant of good faith and fair dealing claim because in the franchise context the covenant of good faith and fair dealing applies only to the termination of a franchisee, and Mr. Takiedine remained a franchisee.[2] Also dismissed were three of Mr. Takiedine's breach of contract claims, as well as the impracticability, unconscionability, and fraud claims. Thereafter, the parties stipulated to the dismissal of several more of Mr. Takiedine's claims.[3]

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on

---

[2] Mr. Takiedine's Franchise Agreements for the stores at issue in this litigation expired in 2019.

[3] Specifically, the parties stipulated to the dismissal of Mr. Takiedine's conversion claim and his breach of contract claims concerning credit card and advertising fees. And although the parties did not file a stipulation of dismissal concerning Mr. Takiedine's unjust enrichment claim, Mr. Takiedine agreed to the dismissal of that claim in his response to the summary judgment motion.

2

which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson,* 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

7-Eleven seeks the dismissal of Mr. Takiedine's breach of contract claims concerning 7-Eleven's alleged failure to treat him as an independent contractor and provide necessary maintenance for his stores. As explained in detail below, the Court grants 7-Eleven's motion because Section 2 of the Franchise Agreements does not impose a duty on 7-Eleven, prohibit 7-Eleven from requiring Mr. Takiedine to stock and sell certain products, or prohibit 7-Eleven from interacting with Mr. Takiedine's employees.

### I. Failure to Treat Mr. Takiedine as an Independent Contractor

Mr. Takiedine alleges that 7-Eleven failed to treat him as an independent contractor as required under the Franchise Agreements by, "*inter alia*, forcing Plaintiff to sell products that he did not order and interfering with Plaintiff's management of his staff and communicating directly to Plaintiff's staff in a harmful way." Am. Compl. ¶ 75. Mr. Takiedine argues that this claim arises from Section 2 of the Franchise Agreements. Section 2 states:

> You [Mr. Takiedine] and we [7-Eleven] agree that this Agreement creates an arm's-length business relationship and does not create any fiduciary, special or other similar relationship. You agree: (a) to hold yourself out to the public as an independent contractor; (b) to control the manner and means of the operation of the Store; and (c) to exercise complete control over and responsibility for all labor relations and the conduct of your agents and employees, including the day-to-day operations of the Store and all Store employees. You and your agents and employees may not: (i) be considered or held out to be our agents or employees or (ii) negotiate or enter any agreement or incur any liabilities in our name, on our behalf, or purporting to bind us or any of our or your successors-in-interest. Without in any way limiting the preceding statements, we do not exercise any discretion or control over your employment policies or employment decisions. All employees of the Store are solely your employees and you will control the manner and means of the operation of the Store. No actions you, your agents or employees take will be attributable to us or be considered to be actions obligating us.

Franchise Agreements § 2.

4

In response, 7-Eleven argues that the language of Section 2 does not impose any obligations on 7-Eleven. Rather, it claims that Section 2 only contains an acknowledgement by the parties that they have an arms-length business relationship and sets forth duties imposed on Mr. Takiedine to conduct his business as an independent contractor.

Mr. Takiedine claims that the doctrine of equitable estoppel prevents 7-Eleven from "enjoying the benefits of Plaintiff's independent contractor status, while simultaneously escaping its own obligations to treat Plaintiff as such when it suits it." Opp'n to Mot. for Summ. J. 10. Mr. Takiedine also cites testimony from 7-Eleven's Market Manager Janice Tangradi and 7-Eleven's field consultant Matt Westiner, who both admitted during their depositions that 7-Eleven franchisees are independent contractors. Furthermore, Mr. Takiedine cites 7-Eleven's agreement with a third-party manufacturer of its brand name products, which states that the manufacturer "acknowledges that 7-Eleven's franchisees are independent contractors who determine the manner and means of operating their own stores pursuant to the terms of the franchise agreements and arrangements related thereto." Counter-Statement of Material Facts Ex. C at § 5.02.

Section 2 does not impose a duty on 7-Eleven as alleged by Mr. Takiedine. First, the plain language of Section 2 ties all referenced duties and obligations to Mr. Takiedine, not 7-Eleven. Second, "[e]quitable estoppel is not a separate cause of action. It may be raised either as an affirmative defense or as grounds to prevent the defendant from raising a particular defense." *Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990). Therefore, if Section 2 of the Franchise Agreements does not impose an obligation on 7-Eleven, Mr. Takiedine cannot invoke the doctrine of equitable estoppel to create one. And third, none of the evidence Mr. Takiedine cites is material to whether Section 2 of the Franchise Agreements imposes the duties that he seeks to enforce.

5

However, as next discussed, even if Section 2 did impose some duties on 7-Eleven, it cannot be invoked to prevent 7-Eleven from (1) requiring Mr. Takiedine to stock and sell certain products, or (2) interacting with Mr. Takiedine's employees.

## A. Mr. Takiedine's Claim Concerning Merchandising

There is no language in Section 2 that can be interpreted as preventing 7-Eleven from requiring its franchisees to stock and sell certain products. In fact, Section 2 does not even mention merchandising, i.e., the presence or absence of certain products, the placement of products within the store, or the quantity of those products. Merchandising is instead addressed in Sections 15(a)–(g) of the Franchise Agreements. For example, Section 15(c) requires that Mr. Takiedine:

> [M]aintain in the Store at all times a Reasonable and Representative Quantity of all Proprietary Products listed in Exhibit G or otherwise in writing. We [7-Eleven] may change the Proprietary Products that you are required to offer from time to time upon reasonable notice . . . .[4]

Franchise Agreements § 15(c).

And Section 15(b) requires Mr. Takiedine:

> [T]o carry at the Store all Categories of Inventory that we [7-Eleven] specify. You may delete any Category if such Category does not meet sales goals that we establish, provided that you obtain our prior written consent, which consent will not be unreasonably withheld.[5] You agree to carry, use and offer for sale at the Store only the

---

[4] Mr. Takiedine highlights that only 11 products were listed as proprietary products in the Franchise Agreements and suggests that 7-Eleven's decision to add more proprietary products is a violation of the independent contractor provision. In support of this argument, Mr. Takiedine claims that 7-Eleven makes a larger profit when its franchisees sell 7-Eleven branded products. However, Section 15(c) explicitly grants 7-Eleven the right to unilaterally modify the proprietary products list, and nothing prevents 7-Eleven from invoking its rights under its contracts to make a larger profit. There is no claim by Mr. Takiedine invoking the "reasonable notice" language.

[5] Mr. Takiedine vaguely references that he requested to not sell some of the "7-Select" product line and 7-Eleven's response "was not a favorable reaction." June 8, 2018 Takiedine Dep. 240:8–13. However, he immediately added that he did not know what would happen if he decided not to sell those products. *Id.* at 240:14–20 ("Now, I don't know what would happen if I decided not to sell it . . . if I decided not to sell 7-Eleven 7-Select products, I don't really know."). Moreover, Mr. Takiedine did not advance any breach of contract claims based on Section 15(b) in his Amended Complaint.

6

> Inventory and other products that are consistent with the type, quantity, quality, and variety associated with the 7-Eleven Image and as we specify in the Agreement. You agree to comply with all of our standards and specifications for all Inventory, including Proprietary Products and other products and services carried, used or offered for sale at the Store.[6]

*Id.* at § 15(b).

These provisions are typical in Franchise Agreements and do not provide that 7-Eleven controlled the day-to-day manner of Mr. Takiedine's operations. *See, e.g., Myszkowski v. Penn Stroud Hotel*, 634 A.2d 622, 627 (Pa. Super. Ct. 1993) ("[T]he fact that Best Western sets certain standards in order to maintain a uniform quality of inn service only addresses the result of the work and not the *manner* in which it is conducted."); *see also Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 740 (Pa. 1977) ("It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product.").

Furthermore, interpreting Section 2 as preventing 7-Eleven from invoking its rights to require its franchisees to sell certain products would eviscerate Sections 15(a)–(g).[7] *See Lesko v.*

---

[6] Mr. Takiedine notes that the "7-Select" product line was not listed as proprietary under Exhibit G and cites the testimony of the former Vice President of the Penn/Jersey Zone for 7-Eleven, Eric DeFrancisco, who admitted as much. *See* DeFrancisco Dep. 54:12–14. Mr. Takiedine claims, therefore, that 7-Eleven cannot hide behind Section 15(c), and that its pressure on Mr. Takiedine to sell "7-Select" products violated the independent contractor provision. However, Mr. Takiedine ignores Section 15(b), in which he agreed to "carry at the Store all Categories of Inventory that [7-Eleven] specif[ied]." Franchise Agreements § 15(b). This provision is not limited to "proprietary products." Thus, Mr. Takiedine's focus on the proprietary products designation is misplaced.

[7] In addition to Sections 15(b) and 15(c), Mr. Takiedine also claims that 7-Eleven breached Section 15(f), which relates to suggested retail pricing, and Section 15(g), which relates to recommended vendors. However, Mr. Takiedine concedes that he can price products however he wants, and claims only that doing so will "be held against him," that the "field consultant's behavior at the store will change" to express "displeasure," that he "will hear about it and it will leave a sour taste in 7-Eleven's mouth" and make him "undesirable," and that the field consultants will "have things to say" and "complain." June 7, 2018 Takiedine Dep. 188:7–189:3; June 8, 2018 Takiedine Dep. 40:19–41:4. These suppositions and allegations are immaterial to establishing a breach of Section 15(f), let alone Section 2. In addition, the Court will not entertain an attempt by Mr. Takiedine to establish a breach related to recommended vendors because the Court previously dismissed his stand-alone claim under Section 15(g).

*Frankford Hospital-Bucks County*, 15 A.3d 337, 342 (Pa. 2011) (explaining that courts should not "interpret one provision of a contract in a manner which results in another portion being annulled"); *see also Good Will Hunting Club, Inc. v. Range Res., Inc.*, No. 11-1152, 2012 WL 722614, at *3 (M.D. Pa. Mar. 1, 2012) ("[E]very agreement is made and to be construed with due regard to the known characteristics of the business to which it relates; and hence, the language used in a contract will be construed according to its purport in the particular business.") (quoting *Franklin Sugar Ref. Co. v. Howell*, 118 A. 109, 110 (Pa. 1922)).

Section 2 will not be interpreted as preventing 7-Eleven from requiring Mr. Takiedine to stock and sell certain products.

### B. Mr. Takiedine's Claim Concerning "Interference" With His Employees

Mr. Takiedine also claims that 7-Eleven violated Section 2 of the Franchise Agreements by "interfering with Plaintiff's management of his staff and communicating directly to Plaintiff's staff in a harmful way." Am. Compl. ¶ 75. He asserts that 7-Eleven told his store managers what to do, required them to buy merchandise, and retaliated against Mr. Takiedine with poor inspection reports if the managers did not comply. Mr. Takiedine also claims that a 7-Eleven field consultant disclosed to one of Mr. Takiedine's managers that Mr. Takiedine was considering a buyout from 7-Eleven, making the manager fearful of losing his job.

The evidence that Mr. Takiedine cites in support of these allegations largely overlaps with his claim that he was forced to stock and sell certain products, which has already been discussed at length above. However, to the extent his allegations pertain to issues unrelated to stocking and selling products, Mr. Takiedine still fails to identify a triable issue of fact.

Regarding 7-Eleven's supposed retaliation, Mr. Takiedine appears to take issue with three poor inspection reports: (1) a report related to out-of-stock products that triggered a letter of

8

notification; (2) a report related to cleanliness where one of his stores scored a 31 out of 100; and (3) a store walk report that supposedly included various inaccuracies.

As to the first report, Mr. Takiedine claims that 7-Eleven did not perform a visual inspection to determine whether his products were out of stock and merely relied on a separate report that generates out-of-stock conditions. *See* June 8, 2018 Takiedine Dep. 193:20–24 ("They didn't see it. They didn't walk around and saw [sic] what's out of stock. There's a report, it states out of stock."); *id.* at 194:11–16 ("Q. Are you saying that whoever issued the letter of notification . . . didn't really go out and look hard at the store but just pulled a report in the back to see what was out of stock? A. Out of stock, yes, yeah."). He also notes that he had never received a prior letter of notification and that the inspection took place while the store was under construction.[8] However, after being shown photographs of his store from the date of the inspection in question, Mr. Takiedine conceded that they depicted out-of-stock conditions. *See* June 8, 2018 Takiedine Dep. 195:19–24 ("Q. Would you agree with me that the pictures . . . depict . . . out-of-stock conditions at the store? A. Uh-huh, yeah.").

Second, Mr. Takiedine claims that an inspection where one of his stores received a score of 31 out of 100 was not "an accurate assessment of the store." June 8, 2018 Takiedine Dep. 242:12–13. However, his actual complaints boil down to the inspector "nitpicking" by taking pictures underneath the store's microwave and the back of the Slurpee machine "where all of the leaks and the syrup is," as well as a general assertion that this nitpicking was "maybe" retaliation for not going along with the way 7-Eleven wants things done or "maybe" retaliation for the lawsuit. *Id.* at 241:25–243:23. Beyond conclusively claiming that the store did not deserve the low score it received, Mr. Takiedine does not appear to contest the existence of the specific cleanliness issues

---

[8] The letter of notification included no reference to the construction or the appearance of the store and complained only that Mr. Takiedine's store had unacceptable and extreme out-of-stock conditions.

9

the inspector identified. Furthermore, Mr. Takiedine admits that he hired an employee exclusively to clean the store and that the store's score increased from 31 out of 100 to 44 out of 100 less than a week later.

Third, one of Mr. Takiedine's managers asserts that a 7-Eleven inspector took off points in a store walk report for a dirty glass shelving unit and cabinets that were faded and rusted, but all these items had in fact been recently cleaned and were inaccurately reported. However, Mr. Takiedine's manager also conceded that the store passed the inspection, and no one has ever discussed the report with him since it was issued from 7-Eleven.

All three of these inspection reports are immaterial to Mr. Takiedine's claim that 7-Eleven interfered with his employees. Although he claims that the reports are false, his own evidence does not support this conclusion.[9] It is also unclear how, if at all, these inspection reports actually influenced Mr. Takiedine or his employees. When closely examined, Mr. Takiedine's "assertions that [he is] being unfairly targeted by [7-Eleven] in retaliation" reveal themselves to be "based upon . . . speculation," and "[g]enuine issues of material fact cannot be raised by speculation and conclusory allegations."[10] *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 212 (D.N.J. 2001) (citing *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Engineers, AFL-CIO*, 982 F.2d 884, 890 (3d Cir. 1992)).

Finally, the 7-Eleven field consultant's alleged disclosure to Mr. Takiedine's manager regarding a potential buyout is likewise immaterial. First, Mr. Takiedine admits that the only

---

[9] At most, Mr. Takiedine's manager identified a couple inaccuracies in the store walk report, but these are immaterial because the store nonetheless passed the inspection.

[10] Furthermore, 7-Eleven gave Mr. Takiedine an opportunity to cure his out-of-stock conditions; uncured, those conditions could have resulted in the issuance of a notice of material breach of the Franchise Agreement, *see* Letter of Notification, and "as a matter of law, [a franchisee's] material breach of the Franchise Agreement trigger[s] [the franchisor's] right to terminate the Agreement, rendering any ulterior financial motive irrelevant." *Dunkin' Donuts Inc. v. Guang Chyi Liu*, 79 F. App'x 543, 547 (3d Cir. 2003).

10

consequence of this disclosure was that Mr. Takiedine needed to reassure his manager that he was not retiring. Second, Section 2 merely states that 7-Eleven does not "exercise any discretion or control over [Mr. Takiedine's] employment policies or employment decisions. All employees of the Store are solely [Mr. Takiedine's] employees and [Mr. Takiedine] will control the manner and means of the operation of the Store." Franchise Agreements § 2. The record shows that Mr. Takiedine, not 7-Eleven, had full control over his employment policies, hiring and firing, supervision, and setting his employees' schedules and compensation. Although the field consultant's disclosure may have been none of the consultant's business or otherwise an example of a busy-body's gossip, nothing in Section 2 prohibits 7-Eleven employees from talking with franchisees' employees, and this conversation in no way demonstrates that 7-Eleven took "control" over Mr. Takiedine's employees.

In sum, Section 2 does not impose an obligation on 7-Eleven, prevent 7-Eleven from requiring Mr. Takiedine to stock and sell certain products, or prevent 7-Eleven from interacting with Mr. Takiedine's employees. Therefore, the Court grants 7-Eleven's motion for summary judgment on Mr. Takiedine's "independent contractor" breach of contract claim.

## II. Failure to Provide Necessary Maintenance

Section 20(d) of the Franchise Agreements, which falls under "Maintenance and Utilities," provides in part that "[w]hen we [7-Eleven] consider it necessary during the Term of this Agreement, we agree to . . . (4) repair the floor covering, exterior walls, roof, foundation, and parking lot." Franchise Agreements § 20(d). Mr. Takiedine claims that 7-Eleven violated Section 20(d) because his maintenance requests concerning a leaky roof and potholes in his parking lots have gone unheeded.

7-Eleven argues that summary judgment on this claim is warranted because Mr. Takiedine cannot prove that 7-Eleven considered Mr. Takiedine's requested repairs "necessary" as required under Section 20(d). Mr. Takiedine responds that 7-Eleven had a duty under Pennsylvania law to exercise its discretion in good faith to determine when a repair was "necessary." *See Ahearn v. Marsh & McLennan Companies, Inc.*, 124 F. App'x 118, 122 (3d Cir. 2005) ("Ordinary contract principles require that, where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith—a requirement that includes the duty to exercise the discretion reasonably."). Mr. Takiedine asserts that his requested repairs were objectively necessary, and therefore 7-Eleven's failure to consider them necessary was in bad faith, breaching the contract.

The Court has been down this road of good faith before with Mr. Takiedine. As explained in its two prior opinions in this matter, "under Pennsylvania law[,] standards of good faith and fair dealing apply to franchise relationships *only in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee*." Feb. 22, 2019 Mem. (emphasis added) (citing June 27, 2018 Mem. 7–9). Because neither the Pennsylvania Supreme Court nor the Third Circuit Court of Appeals has definitively held that the duty of good faith extends beyond actual franchise termination, district courts in Pennsylvania have traditionally declined to broaden the scope of the duty. *See Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 419 (W.D. Pa. 2005) ("In the absence of clear guidance from the Supreme Court of Pennsylvania or the Court of Appeals for the Third Circuit, this Court declines to extend the scope of duty [beyond termination]."); *Keshock v. Carousel Sys., Inc.*, No. 04-758, 2005 WL 1198867, at *3 (E.D. Pa. May 17, 2005) ("Pennsylvania courts have never extended the franchisor's good faith duty beyond the context of termination.").

Here, Mr. Takiedine does not claim that 7-Eleven failed to make repairs that 7-Eleven *subjectively* considered necessary. Rather, Mr. Takiedine's sole argument is that 7-Eleven failed to make repairs that were *objectively* necessary, acting in bad faith and, in turn, breaching its duty to perform necessary maintenance. However, as just explained, neither the Supreme Court of Pennsylvania nor the Third Circuit Court of Appeals has extended a franchisor's duty to act in good faith beyond the context of terminating the relationship altogether. This Court will not do so here. Looking to the terms of the contract, the parties agreed that 7-Eleven would provide maintenance "[w]hen we [7-Eleven] consider it necessary during the Term of this Agreement." Franchise Agreements § 20(d). The evidence shows that 7-Eleven *did not* make repairs when it *did not* consider them necessary (even if Mr. Takiedine did), and 7-Eleven *did* make repairs when it *did* consider them necessary. That is all the contract demanded of 7-Eleven. The discretion to undertake such repair work resided in 7-Eleven alone. Because Mr. Takiedine has not identified evidence that 7-Eleven failed to provide maintenance that 7-Eleven considered necessary, there is no dispute of material fact as to whether 7-Eleven breached a duty under Section 20(d) of the Service Agreements.[11]

For these reasons, the Court grants 7-Eleven's motion for summary judgment on Mr. Takiedine's "necessary maintenance" claim.

---

[11] Even if the duty of good faith and fair dealing applied, Mr. Takiedine cannot use the duty to limit 7-Eleven's "unfettered discretion" where reading the duty into Section 20(d) would "contradict the express terms of the contract, which provide that [7-Eleven] is the relevant decisionmaker . . . [a]nd these terms impose no constraint on [7-Eleven]'s discretion." *Cessna v. REA Energy Coop., Inc.*, 258 F. Supp. 3d 566, 586 (W.D. Pa. 2017), *recons. denied*, No. 16-42, 2018 WL 816844, at *3 (W.D. Pa. Feb. 9, 2018), *aff'd*, 753 F. App'x 124 (3d Cir. 2018).

## Conclusion

For the foregoing reasons, 7-Eleven's motion for summary judgment is granted. An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE