# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AZMI TAKIEDINE, | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **No. 17-4518** |
| 7-ELEVEN, INC., | : | |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                           JULY 29, 2021

     Azmi Takiedine moves to lift the stay the Court imposed on February 22, 2019. The Court imposed the stay because it held that some of Mr. Takiedine's claims were subject to an arbitration agreement that Mr. Takiedine and 7-Eleven signed. Therefore, while Mr. Takiedine's claim is styled as a motion to lift the stay, the Court construes it as a motion for reconsideration of the February 22, 2019 Order. Because of the unique nature of the arbitration agreement, were the Court to deny Mr. Takiedine's motion, his stayed claims would not be arbitrated, but would rather remain in perpetual legal "limbo." While limbo is only the first circle of hell,[1] it is a sufficiently harsh and unsatisfactory outcome for all concerned to justify reexamining the Court's stay order, even though Mr. Takiedine's motion is almost two years late. And because the Court concludes that the arbitration agreement is invalid, the Court will grant Mr. Takiedine's motion for reconsideration, and will lift the stay.

## BACKGROUND

     Azmi Takiedine was a 7-Eleven franchisee for over 40 years. He brought suit in 2017, alleging that 7-Eleven had tried to make his business unprofitable as a part of a "wider scheme to

---

[1] *See* Dante Alighieri, The Divine Comedy (The Inferno), Canto IV (1321).

drive out [franchisees] . . . and 'take back' several 7-Eleven stores in the greater Philadelphia market." Doc. No. 1 at 8. During the pendency of this litigation, Mr. Takiedine ceased operating his franchises.

Every franchisee of 7-Eleven must sign a franchise agreement with 7-Eleven, along with several exhibits which fix the rights and obligations of both parties. 7-Eleven's duties regarding "vendor negotiating practices," which are at issue in this motion, are in paragraph 15(j) of the Franchise Agreement. Paragraph 15(j)(1) states that 7-Eleven must "make a commercially reasonable effort to obtain the lowest cost for products and services" from vendors, including by identifying available "discounts, allowances and other opportunities for price adjustments." Doc. No. 146-4 at 3. Paragraph 15(j)(2) states that 7-Eleven "will treat all discounts and allowances in the manner provided for in the definition of Cost of Goods Sold set forth in Exhibit E." *Id.*

According to paragraph 15(k) of the agreement, all "disputes relating to or arising from" paragraph 15(j) are governed by "Exhibit J," also referred to by the parties as the "arbitration agreement." The arbitration agreement is presented on a "take it or leave it" basis—all prospective franchisees must sign it. The arbitration agreement sets forth a detailed procedure for resolving disputes arising from paragraph 15(j) of the Franchise Agreements. Of importance here, these disputes cannot be addressed by individual franchisees. Rather, all disputes arising from paragraph 15(j) are handled by the "Franchise Selection Committee" ("the Committee"). Doc. No. 146-5 at 1. There are five members of the Committee, all of whom are current 7-Eleven franchisees who meet certain criteria. *Id.* Vacancies on the Committee are subject to a self-perpetuating process and filled by a vote of the remaining members. *Id.* The Committee must select and retain a "Third Party Reviewer" each year. *Id.* 7-Eleven then provides the Committee with a list of all vendor agreements that 7-Eleven entered into during the previous year. *Id.* at 2. The Committee reviews

those agreements and identifies which ones it would like the Third Party Reviewer to examine.  *Id.*

If the Third Party Reviewer concludes that 7-Eleven breached its paragraph 15(j) duties, it must

notify the Committee and 7-Eleven.  *Id.*  The arbitration agreement sets forth a three-step process

for resolving these disputes.  First, the Committee and 7-Eleven are obligated to attempt to resolve

the dispute informally within 30 days.  *Id.*  If negotiation does not resolve the dispute, the parties

are referred to non-binding mediation.  *Id.* at 3.  If non-binding mediation cannot resolve the

dispute within 30 days, the dispute is referred to arbitration.  *Id.*  Arbitration proceedings must be

governed by the rules of the American Arbitration Association.  *Id.*

     While arbitration agreements have become common in the business world for one reason

or another, this particular arbitration agreement is unique in at least four important ways.  First,

individual franchisees have no way to litigate their claims—through the Committee, arbitration,

the courts, or otherwise.  If a franchisee happens to know a member of the Committee, they might

talk to them about their complaint informally.  But during an evidentiary hearing held on this

motion, current and former members of the Committee testified that they could not actually

respond to these informal complaints because of a confidentiality agreement that they, as

Committee members, signed with 7-Eleven.  Second, the arbitration agreement included a

contractual limitations period, whereby all complaints by the Committee had to be brought within

the calendar year immediately following the year in which the Third Party Reviewer conducted its

review.  As a result, even if a franchisee like Mr. Takiedine could bring a claim, the confidentiality

agreement would prevent the franchisee from learning whether the contractual limitations period

had run.  Indeed, no party told the Court whether this contractual period has run in this case, though

it likely has.  Third, there is no mechanism to align or try to align the Committee's interests with

that of franchisees.  As noted above, vacancies are filled by current members of the Committee—

or by 7-Eleven if the Committee is unable to find a person to fill the role.  Committee members are not elected by current franchisees, nor may current franchisees vote to remove a member for unsatisfactory performance.   Fourth, one former committee member testified that during the decade he was on the Committee, the Committee never used the dispute resolution procedures. The Committee never did so because the unavailability of damages meant that the Committee has little or no leverage to force 7-Eleven to change its vendor negotiating practices.

In sum, because of the arbitration agreement, franchisees like Mr. Takiedine are unable to bring claims on their own.  Instead, they must trust that the Committee will somehow ensure that 7-Eleven is complying with its paragraph 15(j) duties.   They are unable to influence the Committee, directly or indirectly.   And the unavailability of damages means that even if the Committee was inclined to use the procedures in Exhibit J, it has little leverage to advocate on behalf of 7-Eleven franchisees.

## PROCEDURAL HISTORY

This case has a protracted procedural history.[2]  Mr. Takiedine's Amended Complaint included two claims arising out of 7-Eleven's obligations under paragraph 15(j)[3] of the Franchise Agreement: a "lowest prices" claim and a "proprietary products" claim.  Mr. Takiedine's lowest prices claim is that 7-Eleven failed to negotiate the lowest prices from vendors on behalf of franchisees.   Mr. Takiedine's proprietary products claim is related insofar as it alleges that 7-

---

[2]     The Court writes primarily for the parties, and assumes familiarity with the facts as discussed in the Court's prior opinions. *See Takiedine v. 7-Eleven, Inc.*, No. 17-cv-4518, 2018 WL 3141461 (E.D. Pa. June 27, 2018); *Takiedine v. 7-Eleven, Inc.*, No. 17-cv-4518, 2019 WL 934994 (E.D. Pa. Feb. 25, 2019); *Takiedine v. 7-Eleven, Inc.*, No. 17-cv-4518, 2020 WL 1149546 (E.D. Pa. Mar. 5, 2020), *reconsideration denied*, No. 17-cv-4518, 2020 WL 5260514 (E.D. Pa. Sept. 3, 2020).

[3]     While Mr. Takiedine did not cite Paragraph 15(j) in his Amended Complaint, his lowest prices claim directly implicated paragraph 15(j)(1)(i). *Compare* Doc. No. 25 ¶ 79 *with* Doc. No. 146-4 at 3.

Eleven failed to negotiate a right for franchisees to return 7-Eleven's proprietary "7-Select" products that remain unsold, which 7-Eleven required franchisees to carry. Mr. Takiedine alleges that his inability to return unsold proprietary products to the manufacturer or vendor forced him to write-off the unsold goods as an expense.

The Court granted 7-Eleven's motion to stay both of these claims, because paragraph 15(k) of the arbitration agreement stated that all claims arising under paragraph 15(j) were governed by the arbitration agreement. The Court rejected Mr. Takiedine's argument that his proprietary products claim did not arise under paragraph 15(j). The Court reasoned that although paragraph 15(j) did not explicitly discuss returns, Mr. Takiedine was arguing that 7-Eleven should have negotiated more effectively on behalf of its franchisees so that vendors and manufacturers would accept returns, bringing his claim within paragraph 15(j). The Court also rejected Mr. Takiedine's argument that his proprietary products claim actually arose under paragraph 15(b), because paragraph 15(b) was not mentioned anywhere in his Amended Complaint. More than a year and a half later, Mr. Takiedine returned to argue that his proprietary products claim was actually rooted in paragraph 15(c). The Court rejected this argument as well, noting that paragraph 15(c) was not mentioned in the Amended Complaint either, and that Mr. Takiedine "should not have kept [paragraph] 15(c) on the bench if he believed it was the star quarterback he proclaims." Doc. No. 125 at 10-11.

More recently, Mr. Takiedine filed his motion to lift the stay. Doc. No. 140-3. He argues that the stay should be lifted for three reasons. First, he raises his earlier argument that he has asserted "several other allegations . . . unrelated to 7-Eleven's obligations under paragraph 15(j)" including allegations of 7-Eleven's obligations under paragraph 15(c), and that all of these allegations are not subject to the arbitration agreement. *Id.* at 2-3. Second, he argues that

arbitration was not appropriate because the agreement did not give Mr. Takiedine an effective way to vindicate his cause of action. *Id.* at 6-7. Third, he argues that 7-Eleven had defaulted in proceeding with the arbitration. *Id.* at 8.[4]

7-Eleven responds that Franchise Agreement stated that the procedures set forth in the arbitration agreement were the "exclusive procedures" for resolving vendor negotiating practices disputes. In its opening brief, 7-Eleven disagreed with Mr. Takiedine's argument that he could play no role in the Committee's process, noting that Mr. Takiedine's counsel had represented that he would pursue arbitration. 7-Eleven argued that it was Mr. Takiedine who had failed to "get the ball rolling on the arbitration," (Doc. No. 141 at 14-15), and that it was his fault for dropping the issue for nearly two years after the claims were stayed.

After the parties filed their initial briefs, the Court noticed that there were three outstanding issues that the briefs had not addressed. First, it appeared that there was a factual dispute about whether franchisees had any role to play in bringing their claims before the Committee. 7-Eleven appeared to argue that Mr. Takiedine could have done so, whereas Mr. Takiedine argued that he could not. The plain text of Exhibit J likewise failed to state whether or how individual franchisees could bring issues to a Committee member's attention. Second, 7-Eleven argued that Mr. Takiedine's claim was time-barred by the contract's limitations period. Mr. Takiedine argued that this contractual limitations period did not bar his claim because it applied only to the Committee and the Third Party Reviewer. Third, Mr. Takiedine argued that the arbitration agreement was not enforceable because it violated Pennsylvania public policy to enforce an arbitration agreement that gave a plaintiff no avenue to pursue relief. Mr. Takiedine did not cite any cases to support this argument.

---

[4]     Mr. Takiedine also states that he only wishes to pursue his proprietary products claim, and that if the Court grants the motion to lift the stay, he will voluntarily dismiss his lowest prices claim.

The Court held an evidentiary hearing to hear additional evidence on the first two issues on April 20, 2021.  After the evidentiary hearing was concluded, the Court ordered additional briefing on whether the arbitration agreement was enforceable.

### LEGAL STANDARD

To succeed on a motion for reconsideration, the moving party "must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law [or fact] or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (per curiam); *accord Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

Accordingly, "[d]isagreement with the Court's ruling is not proper grounds for a motion for reconsideration." *Smith v. Unilife Corp.*, No. 13-cv-5101, 2015 WL 115581, at *1 (E.D. Pa. Jan. 7, 2015).  "Because federal courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly." *Douris v. Schweiker*, 229 F. Supp. 2d 391, 408 (E.D. Pa. 2002) (quoting *Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F. Supp. 937, 943 (E.D. Pa. 1995); *see also Johnson v. BB & T Corp.*, No. 17-cv-4490, 2018 WL 1518618, at *2 (E.D. Pa. Mar. 28, 2018) ("Third Circuit law is fairly clear that motions for reconsideration . . . are to be granted sparingly because of the interests in finality and conservation of scarce judicial resources.") (citations and internal quotation marks omitted).

### DISCUSSION

I.    **Whether Mr. Takiedine's Motion is Untimely**

7-Eleven argues that Mr. Takiedine's motion is merely a belated request for reconsideration of the Court's February 22, 2019 Order.  Mr. Takiedine argues that this is not a motion for reconsideration, but rather what he named it, a motion to lift the stay.

7-Eleven is correct that Mr. Takiedine's motion is best characterized as a motion for reconsideration of the Court's February 22, 2019 Order.  The standard applied to a motion is determined by the motion's substance, not the labels used by the moving party.  Mr. Takiedine cannot evade the strict standard applied to motions like this one merely by omitting the words "motion for reconsideration."  The February 22, 2019 Order considered 7-Eleven's motion to stay both of Mr. Takiedine's vendor negotiating practices claims.  Mr. Takiedine had raised four arguments in opposition to the motion to stay: (1) that 7-Eleven waived its right to arbitrate, (2) that "Vendors" as defined in paragraph 15(j)(1) did not include manufacturer's of 7-Eleven's proprietary products, (3) that the arbitration provision did not apply to the "7-Select" line because 7-Select did not exist when Mr. Takiedine signed the Franchise Agreements, and (4) that Mr. Takiedine's proprietary products claim arose from paragraph 15(b) of the Franchise Agreement, not paragraph 15(j).  *See* Doc. No. 33 at 19-22.  But Mr. Takiedine never argued at the time that the arbitration agreement was unenforceable.  And there is no reason that he could not have done so, because he does not argue that Pennsylvania's unconscionability law has materially changed since February 2019.  This is plainly a motion for reconsideration, based on an argument that Mr. Takiedine could well have but failed to make more than two years ago.

The question then is whether Mr. Takiedine meets the strict requirements for a motion for reconsideration.  As 7-Eleven correctly notes, this motion is governed by Local Rule 7.1(g), not Federal Rule of Civil Procedure 60(b).[5]  Local Rule 7.1(g) requires that all motions for reconsideration be filed "within fourteen (14) days after the entry of the order concerned."  *See*

---

[5]      This is so because Mr. Takiedine seeks reconsideration of an "interlocutory" order, not a final order.  The Court's February 22, 2019 Order is interlocutory because a final judgment has not been issued. *See, e.g.*, *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers' Statewide Benefit Funds*, No. 18-cv-16328, 2019 WL 3812889, at *11 (D.N.J. Aug. 14, 2019), *aff'd* 974 F.3d 386 (3d Cir. 2020) (noting that a local civil rule applied rather than Rule 60(b) because the district court retained jurisdiction over the case).

E.D. Pa. Local R. 7.1(g).  Therefore, Mr. Takiedine's motion for reconsideration was due on March 11, 2019.[6]  Because he did not file this motion until February 15, 2021, his motion is almost two years late.

Nevertheless, a "district court can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment." *Black v. Cmty. Educ. Centers, Inc.*, No. CV 13-6102, 2014 WL 12929461, at *2 (E.D. Pa. Apr. 10, 2014) (quoting *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 215 (3d Cir. 2000)).  *See also Mathis v. Christian Heating & Air Conditioning, Inc.*, 91 F. Supp. 3d 651, 656 (E.D. Pa. 2015) (granting motion for reconsideration for motion filed outside of Local Rule 7.1(g)'s 14 day requirement).

Both of these requirements are met here.  7-Eleven has not argued that it relied on this local rule to its detriment.  Of greater fundamental import, Court also finds that there is a sound rationale for reexamining its Order imposing the stay.  Assuming that Mr. Takiedine's motion is meritorious, the Court's February 22, 2019 Order has the effect of leaving his case in permanent "limbo" as mentioned above.  Due to the vagueness of the agreement and the specific nature of the dispute at issue, Mr. Takiedine can neither pursue his claim in federal court nor seek arbitration. Moreover, Mr. Takiedine seems to have been unaware of the contract's requirement that claims would not be arbitrated when the Court entered the stay.  Indeed, instead he and counsel for 7-Eleven *both* seem to have operated on the assumption that if the Court granted 7-Eleven's motion to stay the claims, the case would proceed to arbitration.  In its briefs supporting its motion for a stay, 7-Eleven repeatedly stated that Mr. Takiedine had agreed that his claims would be referred to

---

[6]     Although the Court's Order imposing the stay was signed on February 22, 2019, it was not entered until February 25, 2019.  Local Rule 7.1(g) states that the 14 day window begins with the "entry" of an order, so the later date governs.

mandatory arbitration. *See, e.g.*, Doc. No. 30 at 5.  On March 4, 2019—after the Court granted
the motion to stay and before the 14-day period that Mr. Takiedine could timely file a motion for
reconsideration had expired—counsel for Mr. Takiedine and counsel for 7-Eleven had a phone
call. Doc. No. 146-12 at 1.  Counsel for Mr. Takiedine sent an email memorializing this phone
call, saying: "Confirming our call today, I will get the ball rolling on the arbitration for
Takiedine . . . ." *Id.*  There is no evidence that counsel for 7-Eleven enlightened or forewarned
him that he would be unable to pursue these claims in arbitration.  And even if 7-Eleven had done
so, the fact remains that when the Court entered its February 22, 2019 Order, it did so on the
assumption that the claims would be sent to arbitration, not held in suspense indefinitely. *See* Doc.
No. 70 at 22 ("[T]he Court will stay Mr. Takiedine's vendor negotiating practices claims—
including his claim concerning 7-Eleven's proprietary products—pending the resolution by
arbitration . . . .").  The inequitableness of this situation, and the lack of prejudice to either party
in reviewing the Court's February 22, 2019 Order, prompt the Court to give Mr. Takiedine the
benefit of an exception to the ordinarily strict timeliness requirement for motions for
reconsideration.

## II.    Whether Granting the Motion is Necessary to Avoid "Manifest Injustice"

Even though the Court will forgive this time the motion's untimeliness, Mr. Takiedine must
still satisfy the requirements for a motion for reconsideration.  The Court will only grant a motion
for reconsideration if the movant shows: "(1) an intervening change in the controlling law; (2) the
availability of new evidence that was not available when the court granted the motion for summary
judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."
*White v. Home Depot, Inc.*, No. 17-cv-4174, 2018 WL 4002009, at *1 (E.D. Pa. Aug. 21, 2018)
(quoting *Max's Seafood*, 176 F.3d at 677).  The first two avenues for granting a motion for
reconsideration are clearly inapplicable here: Mr. Takiedine does not argue that there was an

intervening change in the controlling law, nor does he cite any new evidence that was not previously available. Therefore, his motion may only be granted if he can show that reconsideration is necessary to correct a clear error of law or fact or to prevent manifest injustice.

"The Third Circuit Court of Appeals has 'never adopted strict or precise definitions for "clear error of law or fact" or "manifest injustice" in the context of a motion for reconsideration,' but has 'suggested that there is substantial, if not complete, overlap between the two concepts.'" *United States v. Iglesias*, No. 04-cr-00647, 2021 WL 859412, at *2 (E.D. Pa. Mar. 5, 2021) (quoting *In re Energy Future Holdings Corp.*, 904 F.3d 298, 311 (3d Cir. 2018)). "The 'focus' in determining whether a decision was clear error or imposed a manifest injustice 'is on the gravity and overtness of the error.'" *Id.* (quoting *In re Energy Future Holdings Corp.*, 904 F.3d at 312).

Accordingly, the Court will first consider whether the February 22, 2019 Order is wrong as a matter of law on the basis that the arbitration agreement is unenforceable. Next, the Court will consider whether that Order is not just wrong, but so wrong that "adherence to the decision would create a manifest injustice." *Swayne v. Mount Joy Wire Corp.*, No. 10-cv-03969, 2012 WL 13018329, at *2 (E.D. Pa. Jan. 12, 2012) (quoting *Payne v. DeLuca*, No. 2:02-cv-1927, 2006 WL 3590014, at *2 (W.D. Pa. Dec. 11, 2006)).

### A. Whether the Arbitration Agreement is Enforceable

Mr. Takiedine argues that the Court's decision to refer the case to arbitration was wrongly decided, because the arbitration agreement is unconscionable under Pennsylvania law.[7] However, this argument raises an additional complication. Even if Mr. Takiedine is correct that the arbitration agreement is unconscionable, the Federal Arbitration Act created a federal policy in favor of arbitration, preempting many state laws to the contrary. While the FAA has not

---

[7]     The parties agreed that Pennsylvania law applies, so the Court considers only whether the agreement is unconscionable under Pennsylvania law. *See* Doc. Nos. 152 at 2, 153 at 2.

completely displaced state unconscionability laws, it does preempt them in some contexts where they work to undermine the purposes of the FAA. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). Therefore, the larger question of the arbitration agreement's enforceability turns on two subsidiary questions: (1) whether the arbitration agreement is unconscionable under Pennsylvania law; and (2) regardless of the answer to the unconscionability issue, whether the FAA preempts Pennsylvania law in this context.

*i.    Whether the Arbitration Agreement is Unconscionable Under Pennsylvania Law*

Like most jurisdictions, Pennsylvania law distinguishes between two types of unconscionability: procedural unconscionability and substantive unconscionability. Procedural unconscionability refers "to the process by which an agreement is reached and the form of an agreement," whereas "[s]ubstantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999). To prevail on an unconscionability defense, a party must demonstrate both procedural and substantive unconscionability. In other words, that party must show "that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions." *Id.* Pennsylvania law employs a "'sliding scale approach' so that 'where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required.'" *Golden Gate Nat'l Senior Care, LLC v. Beavens*, 123 F. Supp. 3d 619, 631 (E.D. Pa. 2015) (quoting *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 230 (3d Cir. 2012)). As the party asserting the defense of unconscionability, Mr. Takiedine bears the burden of demonstrating that the arbitration agreement is invalid. *Cirino v. L. Gordon Holdings, Inc.*, No. 13-cv-4800, 2014 WL 2880291, at *4 (E.D. Pa. June 25, 2014).

### a. Procedural Unconscionability

An agreement is procedurally unconscionable where "there was a lack of meaningful choice in the acceptance of the challenged provision." *Quillon*, 673 F.3d at 235 (quoting *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007)).   Under Pennsylvania law, contracts of adhesion, which are "standard-form contract[s] prepared by one party, to be signed by the party in a weaker position . . . who adheres to the contract with little choice about the terms" are "generally considered to be procedurally unconscionable."   *Id.* (quoting *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1190 (Pa. 2010)).   "However, contracts cannot be deemed unconscionable 'simply because of a disparity in bargaining power.'"   *Id.* (quoting *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1228 (Pa. 1981)).   Rather, "[f]actors we must consider in determining whether the contract rises to the level of procedural unconscionability include: 'the take-it-or-leave-it nature of the standardized form of the document[,]' 'the parties' relative bargaining positions,' and 'the degree of economic compulsion motivating the "adhering" party[.]'"   *Id.* at 235-36 (alterations in original) (quoting *Salley*, 925 A.3d at 119).[8]

Mr. Takiedine argues that he had little choice but to accept the terms of this provision. Mr. Takiedine had made a living off of running his stores—stores that he had operated since the 1970's.   In the early 2000's, he was presented an agreement that he was not involved in drafting, and which was not negotiable.   He had to agree to the arbitration agreement or lose his stores.

7-Eleven responds that the agreement was not unconscionable because, even if Mr. Takiedine could not negotiate its terms, other 7-Eleven franchisees played a role in drafting it.   7-Eleven also argues that the arbitration agreement was fair, because the 2004 agreement as a

---

[8]      Courts also consider the plaintiff's educational background.   *See Quillon*, 673 F.3d at 235-36 (citing *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 229 (3d Cir. 2008)).   However, there was no testimony regarding Mr. Takiedine's educational or similar background, so this factor does not affect the Court's analysis.

whole "stabilized the company and led to an unprecedented period of success for both franchisees and the company." Doc. No. 146-28 at 1. Finally, 7-Eleven notes that Mr. Takiedine received the "uniform franchise offering circular at least two weeks before he signed the Franchise Agreements," during which time he was able to consider whether signing the agreement was in his best interests.

There is little difficulty in concluding that the arbitration agreement is procedurally unconscionable. Al three factors laid out in *Quilloin* are present. *See Quilloin*, 673 F.3d at 235. 7-Eleven's own witness, Mr. Yount, admitted during the evidentiary hearing that the agreement was "a take it or leave it" contract. The parties were also in vastly different bargaining positions. 7-Eleven is a multi-billion dollar corporation. Mr. Takiedine made his living managing two stores in the Philadelphia area. Finally, Mr. Takiedine was under extreme financial compulsion. He had to choose between losing his livelihood, which he had developed over the approximately 30 years preceding the 2004 agreement, and signing the arbitration agreement. The fact that he was given a couple of weeks to consider his supposed options does not materially change this equation.

### b. *Substantive Unconscionability*

It is not enough for Mr. Takiedine to show that he had a lack of meaningful choice in signing the agreement. He must also show that the arbitration agreement is "unreasonably favorable" to 7-Eleven.

It is unnecessary to summarize all of the instances in which an agreement may be substantively unconscionable under Pennsylvania law. As Mr. Takiedine correctly notes, arbitration agreements are appropriate "so long as the prospective litigant effectively may vindicate his cause of action in the arbitral forum." *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 605 (3d Cir. 2002) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)).

7-Eleven argues that this principle is inapplicable here, because Mr. Takiedine waived only his contractual rights—not federal statutory rights. But 7-Eleven is mistaken.

It is true that the principle announced in *Blair*—the case cited by Mr. Takiedine—was limited to federal statutory rights. *Blair* applied the "effective vindication" rule, whereby arbitration agreements are binding only "'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum' allowing the statute to serve its purposes." *Blair*, 283 F.3d at 605 (alteration in original) (quoting *Gilmer*, 500 U.S. at 28). Under this line of cases, federal courts have invalidated agreements that completely prevented an arbitrator from considering all claims arising from a federal statute, as well as agreements that effectively prevented claimants from vindicating rights arising from a federal statute because the fees for doing so were prohibitively high. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 240 (3d Cir. 2020) (agreement that prevented litigation of claims arising from a federal statute was invalid); *Ryan v. Delbert Servs. Corp.*, No. 5:15-cv-05044, 2016 WL 4702352, at *4 (E.D. Pa. Sept. 8, 2016) (same); *Cirino*, 2014 WL 2880291, at *6 (agreement that imposed substantial costs to vindicate claims arising from a federal statute was invalid).

But while federal law only bars agreements that prevent vindication of federal statutory causes of action, Pennsylvania unconscionability law recognizes a similar rule ensuring the vindication of certain state law rights, including contractual rights. Indeed, one of the cases 7-Eleven cites recognizes this fact, holding that an agreement that effectively stripped a party of all federal and state causes of action (leaving only tribal causes of action) violated both the federal "effective vindication" rule and the doctrine of unconscionability. *See Ryan*, 2016 WL 4702352, at *5 ("Besides being invalid under federal law, the delegation provision is unenforceable as a matter of basic contract law principles.").

Under Pennsylvania law, arbitration agreements are substantively unconscionable if "defendant corporations are effectively immunized from redress of grievances." *Cronin v. CitiFinancial Servs., Inc.*, 352 F. App'x 630, 635 (3d Cir. 2009) (quoting *Thibodeau v. Comcast Corp.*, 912 A.2d 874, 885 (Pa. Super. Ct. 2006)). It is not necessary for an agreement to directly bar a litigant from bringing a claim in order to "effectively immunize" a defendant from redress. Rather, courts applying Pennsylvania law have held that agreements are substantively unconscionable if they make it too expensive for the plaintiff to litigate, *see Cirino*, 2014 WL 2880291, at *6, or barred the plaintiff from bringing some of its claims, *see Williams*, 965 F.3d at 240. As summarized by one Pennsylvania Court, a "fundamental principle of justice is 'everyone should have a day in court.'" *Thibodeau*, 912 A.2d at 885 Accordingly, *Thibodeau* held that an arbitration provision that prevented the plaintiff from joining a class lawsuit was unconscionable, even though the plaintiff could still seek individual arbitration. *See id.*

This arbitration agreement is even more restrictive than any of the agreements discussed above: it completely prevents Mr. Takiedine from litigating his claims anywhere—in a court or before an arbitrator. This "arbitration agreement" (or more accurately, "no arbitration" agreement) does not merely put roadblocks in front of the courthouse door. It completely shuts and locks down any avenue for relief. Therefore, the Court concludes that Pennsylvania courts would find the provision preventing Mr. Takiedine from litigating his case unconscionable.

The Court's view that the arbitration provision is unfairly favorable to 7-Eleven is reinforced by the fact that it also includes a limitation on damages. According to the arbitration agreement, franchisees waived the right to any damages, injunctive relief, or attorneys' fees and costs in the event that an arbitrator found that 7-Eleven breached paragraph 15(j)(1) of the Franchise Agreement. For paragraph 15(j)(2) claims, damages are governed by a complex

formula.[9]  Punitive damages are unavailable for both 15(j)(1) and 15(j)(2) claims.  While 7-Eleven

may be correct that in isolation this provision could be upheld, the dispute resolution procedures

and the limitation on damages work together to "insulate [the] defendant from liability," and are

therefore substantively unconscionable.  *Clerk v. First Bank of Del.*, 735 F. Supp. 2d 170, 186

(E.D. Pa. 2010).[10]

Moreover, the Court cannot sever and save any provision of the arbitration agreement.

"'Pennsylvania courts have held that if an essential term of a contract is deemed illegal, it renders

the entire contract unenforceable' and cannot be severed."  *Williams*, 965 F.3d at 243 (quoting

*Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 214 (3d Cir. 2003)).  For example, in *Williams*, the court

held that a provision in an arbitration agreement requiring the arbitrator to exclusively apply tribal

law, not state or federal law, was not severable from the provision requiring that disputes be

referred to arbitration.  *See id.* at 243-44.  The court concluded that by excising "the invocations

of tribal law in the arbitration agreement, we would 'impermissibl[y] rewrit[e]' the contract."  *Id.*

at 244 (alteration in original).  Here, too, the Court would have to fundamentally rewrite the

arbitration agreement to excise the provision making Committee complaints the exclusive remedy.

---

[9]     The relevant provision in the Franchise Agreement reads: "with respect to a finding that we failed
to satisfy our obligations under Paragraph 15 (j)(2), the damages that can be awarded to you are limited to
an amount equal to the amount of the discount or allowance attributable to your purchases of the goods or
services on which the allowance was given multiplied by the percentage equal to the difference between
100% and the percentage used to calculate the 7-Eleven Charge for the year in question."  Doc. No. 146-5
at 3.  The parties' briefs do not explain what this language means, and as a result the Court is not sure how
it would be applied in practice.  However, because it is unnecessary for present purposes to determine
exactly how much Mr. Takiedine would be able to recover under this provision, the Court did not order
additional briefing on this point.

[10]    Mr. Takiedine also argues that the agreement is substantively unconscionable because it lacks
mutuality, in that it bars only Mr. Takiedine from pursuing arbitration, but allows 7-Eleven to so.  But as
the Third Circuit Court of Appeals has repeatedly recognized, an arbitration agreement "need not have
mutuality of obligation as long as the contract is supported by consideration."  *See Blair*, 283 F.3d at 604
(rejecting argument that arbitration agreement that bound only one party was unenforceable for lack of
mutuality).  *See also Harris*, 183 F.3d at 180 (same).  Therefore, the lack of mutuality in the arbitration
agreement plays no role in this Court's analysis.

Every provision of the arbitration agreement works together, and arbitration is only the last stage in a long process. According to the agreement, the Committee must first appoint a Third Party Reviewer and select vendor agreements for the Third Party Reviewer to examine. Second, the Third Party Reviewer examines the agreements, and determines whether 7-Eleven met its obligations under paragraph 15(j). If the Third Party Reviewer concludes that 7-Eleven did not, it is obligated to notify 7-Eleven and the Committee. Third, the Committee and 7-Eleven are obligated to "endeavor in good faith to resolve any such disputes within 30 days following the date on which it is referred to them." Fourth, if the parties are unable to resolve the issue, the dispute is referred to nonbinding mediation. Fifth, the matter is referred to arbitration if nonbinding mediation does not resolve the problem.

7-Eleven does not show how particular provisions of the Arbitration Agreement may be severed and applied against Mr. Takiedine. In light of the elaborate and cumbersome procedures discussed above, the Court is likewise unable to find a suitable solution. The Court cannot merely replace every reference to the "Franchise Selection Committee" with "Mr. Takiedine" without fundamentally rewriting the contract. Similarly, the time limitations provision is tied to the agreement as a whole, because the one-year limitations period only begins to run when the third party reviewer conducted the review. The Court cannot save the contractual time limitations period, because it would have to rewrite the contract to allow Mr. Takiedine to step into the shoes of the Committee, select a Third Party Reviewer, and then go through the three-step dispute resolution process. The Court cannot save the damages provision because it makes no sense outside of the context of the rest of the agreement. The damages provision might be salvageable if it merely said that damages for violations of paragraph 15(j) are limited. But this damages provision says that the parties (7-Eleven and the Committee) should instruct the arbitrator that

damages are unavailable for violations of paragraph 15(j)(1), and limited for violations of paragraph 15(j)(2). This is inapplicable if (as the Court holds) Mr. Takiedine is permitted to litigate his claim in federal court. To enforce it, the Court would have to replace "the arbitrator" with "the Court," and rewrite the definition of "the parties" to include Mr. Takiedine.

Because no provision of the arbitration agreement can be severed and saved without impermissibly rewriting the contract, the entire arbitration agreement is unenforceable. *See Williams*, 965 F.3d at 243.[11]

      *ii.   Whether the Federal Arbitration Act Preempts Pennsylvania Law in this Context*

The Court has concluded that the arbitration agreement is unconscionable under Pennsylvania law. But the question remains whether Pennsylvania law is preempted in this context by the Federal Arbitration Act.[12] While the Federal Arbitration Act makes arbitration agreements generally enforceable, it includes a "savings clause," whereby arbitration agreements may be deemed invalid "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate

---

[11]    Because the Court finds that Mr. Takiedine has made a strong case for both procedural and substantive unconscionability, it is unnecessary to engage in a "sliding scale" analysis whereby a strong case of procedural unconscionability may make up for a weak case of substantive unconscionability. *See Golden Gate Nat'l Senior Care, LLC*, 123 F. Supp. 3d at 631.

[12]    Neither party raised this issue, but courts may reach questions of federal preemption *sua sponte*, though they need not do so. *Compare O'Toole v. Klingen*, No. 14-cv-6333, 2017 WL 132840, at *10 (D.N.J. Jan. 13, 2017) (raising question of federal preemption *sua sponte*) *with Greisberg v. Bos. Sci. Corp.*, No. 19-cv-12646, 2020 WL 278648, at *4 (D.N.J. Jan. 17, 2020) (declining to reach question of whether plaintiff's claim was preempted by federal law because it was not raised by the parties) *and Evolution Fast Food Gen. P'ship v. HVFG, LLC*, No. 15-cv-6624, 2018 WL 1779377, at *3 (S.D.N.Y. Mar. 28, 2018) (same).

is at issue." *Concepcion*, 563 U.S. at 339 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

*Concepcion* clarified the reach of the savings clause, holding that even facially "generally applicable" doctrines may be preempted if "in practice they have a 'disproportionate impact' on arbitration or 'interfere[ ] with fundamental attributes of arbitration and thus create [ ] a scheme inconsistent with the FAA.'" *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1159 (9th Cir. 2013) (alteration in original) (quoting *Concepcion*, 563 U.S. at 342, 344). In *Concepcion*, the Court considered a California case that had held that class action waivers in most consumer contracts were unconscionable. *See Concepcion*, 563 U.S. at 346-47 (citing *Discover Bank v. Superior Ct.*, 113 P.3d 1100, 1109 (Cal. 2005)). This rule was, in a sense, "generally applicable" because it did not directly concern arbitration, and class arbitration was still permitted under the rule. *See id.* at 349-50. But the Court noted that the FAA contemplated the availability of individual arbitrations. *See id.* Because the California rule made individual arbitrations unavailable in most contexts, the Court held that the rule conflicted with the FAA's general purpose and was therefore preempted by the FAA. *See id.*

Courts within the Third Circuit have had many opportunities to consider *Concepcion*'s effect on state unconscionability rules. The Pennsylvania Superior Court in *Thibodeau* endorsed a general rule that agreements are unconscionable if "the effect of the enforcement of the agreement was corporate immunity." *Thibodeau*, 912 A.2d at 884. Accordingly, *Thibodeau* adopted the California rule that class action waivers in consumer contracts are unconscionable. *See id.* But that California rule was abrogated by the Supreme Court in *Concepcion*, 563 U.S. at 352. Since then, multiple courts have found that *Thibodeau* is no longer good law because it adopted a rule almost identical to the California rule abrogated in *Concepcion*. *See Quillion*, 673

F.3d at 233 ("The Pennsylvania law at issue here is clearly preempted under *Concepcion* . . . .");
*Brown v. TrueBlue, Inc.*, No. 10-cv-5142011 WL 5869773, at *5 (M.D. Pa. Nov. 22, 2011) ("There
can be little doubt that *Thibodeau* is no longer viable following the Supreme Court's decision in
*Concepcion*.").

But although *Concepcion* may have invalidated the narrow holding in *Thibodeau*, courts
have not read it as displacing the unconscionability defense more generally.  Indeed, *Concepcion*
itself listed "fraud, duress, *[and] unconscionability*" as being valid "generally applicable contract
defenses" that fall within the savings clause.  563 U.S. at 339 (emphasis added) (quoting *Doctor's
Assocs., Inc.*, 517 U.S. at 687).   Following *Concepcion*, the Supreme Court has clarified that
*Concepcion* did not preempt a state's general unconscionability laws.  *Marmet Health Care Ctr.,
Inc. v. Brown*, 565 U.S. 530, 532 (2012) (per curiam).  Since that time, courts have read *Marmet*
as affirming the principle that common-law unconscionability defenses do not offend the FAA, so
long as they do not disproportionately disadvantage arbitration agreements in a way that
undermines the effectiveness of the FAA.  *See Coiro v. Wachovia Bank, N.A.*, No. 11-cv-3587,
2012 WL 628514, at *4 (D.N.J. Feb. 27, 2012) (citing *Marmet* and holding that *Concepcion* did
not invalidate New Jersey's fact-sensitive unconscionability defense); *Cisneros v. Am. Gen. Fin.
Servs., Inc.*, No. 11-cv-02869, 2012 WL 3025913, at *4 (N.D. Cal. July 24, 2012) (citing *Marmet*
and noting that "Arbitration agreements . . . are still subject to unconscionability analysis post-
*Concepcion*"); *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 728 (N.D. Cal. 2012), *aff'd*,
549 F. App'x 692 (9th Cir. 2013) ("[T]he Supreme Court in its per curiam decision in *Marmet* . . .
reaffirmed that unenforceability of an arbitration position due to on unconscionability under state
common law is not automatically preempted by the FAA.").

In light of these precedents, the Court concludes that the FAA does not preempt Pennsylvania's unconscionability defense in this context. Pennsylvania's rule that agreements are unconscionable if they effectively insulate one party from liability is "generally applicable" to all contracts. It does not disproportionately affect arbitration agreements. An agreement otherwise identical to this one, except requiring the Committee and 7-Eleven to litigate in federal court after the other procedures were complete, rather than arbitrating the claim, would be just as unconscionable because it would still prevent franchisees from litigating their claim in any forum. Moreover, Pennsylvania unconscionability law does not prevent 7-Eleven and its franchisees from entering into a standard arbitration agreement—or indeed, a "non-standard" agreement, provided that it does not insulate 7-Eleven from liability. But Exhibit J is not really an arbitration agreement, but rather an agreement not to litigate at all. The FAA may protect arbitration agreements, *see Ackley v. The Cheesecake Factory Restaurants, Inc.*, No. 20-cv-5983, 2021 WL 3161487, at *3 (E.D. Pa. July 26, 2021) (holding that a standard arbitration provision was enforceable under the FAA), but it says nothing about "no arbitration" agreements.[13] In sum, the FAA does not prevent Pennsylvania from invalidating agreements that "insulate [the] defendant from liability." *Clerk*, 735 F. Supp. 2d at 186.

## B. Whether Adhering to the Prior Order Would Create Manifest Injustice

Thus far, the Court has concluded that its earlier order ought not have been entered, because the arbitration agreement is invalid. But, as noted, to prevail on a motion for

---

[13]     Indeed, as the First Circuit Court of Appeals has noted, permitting a party to completely insulate itself from liability for breach of contract may prevent the formation of a contract in the first place, because it would render the promise illusory. *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 12 (1st Cir. 2009) (considering the enforceability of an arbitration agreement and noting that "if the remedy [in the agreement] is truly illusory, a court should not order arbitration at all but decide the entire dispute itself"). While the FAA certainly creates a strong preference for arbitration, nothing in *Concepcion* indicates that the FAA extends so far as to preempt the time-honored principle that illusory promises are unenforceable. *See* Restatement (First) of Contracts § 23 (1932).

reconsideration, Mr. Takiedine must "persuade the court that not only was the prior decision wrong, 'but that it was clearly wrong and that adherence to the decision would create a manifest injustice.'" *Segal v. Strausser Enters., Inc.*, No. 07-cv-04647, 2011 WL 3567269, at \*8 (E.D. Pa. Aug. 12, 2011), *aff'd*, 486 F. App'x 240 (3d Cir. 2012) (quoting *Payne*, 2006 WL 3590014, at \*2). "In addition, 'motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources.'" *Osuch v. Optima Mach. Corp.*, No. 10-cv-6101, 2011 WL 2708464, at \*2 (E.D. Pa. July 12, 2011) (quoting *In re Loewen Grp. Inc. Sec. Litig.*, No. 98-cv-6740, 2006 WL 27286, at \*1 (E.D. Pa. Jan. 5, 2006)).

The Court is cognizant of the fact that motions for reconsideration are only granted to correct manifest injustices, particularly where the party seeking reconsideration simply failed to raise an applicable argument and it was left to the Court to raise it and analyze the most pertinent argument.   Nevertheless, this is one of those rare cases.   Denying Mr. Takiedine's motion for reconsideration would not merely leave him without a remedy; it would require the Court to continue enforcing a contract that is invalid under Pennsylvania law.   The Court will exercise its discretion to prevent the manifest injustice of leaving a potentially viable claim in "limbo" in perpetuity. *See, e.g.*, *3D Glob. Sols., Inc. v. MVM, Inc.*, 754 F.3d 1053, 1055-56 (D.C. Cir. 2014) (affirming district court's decision to modify its earlier ruling to conform with state law after considering a relevant rule that the parties had failed to raise); *Jarzyna v. Home Props., L.P.*, No. 10-cv-4191, 2015 WL 12834385, at \*1 n.2 (E.D. Pa. Aug. 13, 2015) (granting motion for reconsideration where underlying order was clearly at odds with Pennsylvania law).[14]

---

[14]   Because the Court finds that the arbitration agreement is invalid, it need not reach Mr. Takiedine's additional argument that 7-Eleven has defaulted in proceeding with the arbitration.

A word about the effect of this memorandum is warranted.  The Court previously held that Mr. Takiedine's "lowest prices" and "proprietary products" claims both arose under paragraph 15(j) of the Franchise Agreement.  *See* Doc. No. 70 at 21.  The Court further held that Mr. Takiedine's belated attempts to root his proprietary products argument in paragraphs 15(b) and 15(c) were impermissible, because these provisions are not cited in his Amended Complaint. *See id.* at 22, Doc. No. 125 at 7-8.  This opinion does not disturb those holdings.  Therefore, by lifting the stay, the Court is only reinstating Mr. Takiedine's 15(j) claims which, as a result, remain open to challenge by 7-Eleven.

## CONCLUSION

For the foregoing reasons, the Court will grant Mr. Takiedine's motion to lift the stay.  An appropriate order follows.

BY THE COURT

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

24