**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AZMI TAKIEDINE,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| v. | : | |
| | : | |
| **7-ELEVEN, INC,** | : | **No. 17-4518** |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                    MARCH *17*, 2022

The words of a contract may give one party enormous flexibility, much to the chagrin and frustration of another party, but its terms are still binding, signer's remorse notwithstanding. On this summary judgment motion, the Court must decide whether Mr. Takiedine has demonstrated that there is a genuine dispute of fact that 7-Eleven failed to uphold its obligations under a franchise agreement. For the reasons that follow, the Court finds that, after years of litigation, Mr. Takiedine has not demonstrated any genuine dispute. Therefore, the Court grants 7-Eleven's motion for summary judgment.

### BACKGROUND

Mr. Takiedine's complaint against 7-Eleven regards two 7-Eleven franchise stores that he operated in Pennsylvania. He had been a 7-Eleven franchisee for over 40 years. In 2004, Mr. Takiedine signed revised franchise agreements with 7-Eleven. But then Mr. Takiedine brought suit in 2017, alleging that 7-Eleven had tried to make his business unprofitable as a part of an alleged plan to "ultimately terminate franchises." Doc. No. 25, Am. Compl. ¶ 30.

Every 7-Eleven franchisee must sign a franchise agreement with 7-Eleven; this agreement establishes the rights and obligations of both parties (the "Franchise Agreement"). 7-Eleven's duties regarding "vendor negotiating practices," which are at issue here, are in paragraph 15(j) of

1

the Franchise Agreement. *See* Doc. No. 25-1, ¶ 15(j). As relevant to Mr. Takiedine's remaining claims, paragraph 15(j)(1)(i) of the Franchise Agreement states that 7-Eleven will "make a commercially reasonable effort to obtain the lowest cost for products and services available from such Vendor to 7-Eleven Stores on a Market Basket Basis by identifying all available discounts, allowances and other opportunities for price adjustments." *Id.*

After years of litigation, Mr. Takiedine has two remaining breach of contract claims pertaining to Paragraph 15(j). He claims that 7-Eleven failed to make a commercially reasonable effort (1) to obtain the lowest cost for products and (2) to secure return privileges from manufacturers and vendors of 7-Eleven's privately branded products if/when those products were not sold in Mr. Takiedine's store.[1]

7-Eleven moves for summary judgment on both of Mr. Takiedine's remaining claims. The motion is ripe for the Court's resolution.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The movant is initially responsible for setting out the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of any genuine

---

[1] This latter claim is also referred to by both parties as his "write-off" or "write-offs" claim based on the fact that, when he was unable to sell these privately branded products, Mr. Takiedine was forced to take a loss in the form of an accounting write-off. The Court has also referred to this as his "proprietary products claim." *See* Doc. No. 70, at 20. For the sake of clarity, the Court will refer to this claim as Mr. Takiedine's "return privileges" claim.

issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited [by the movant] do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The Court views the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

DISCUSSION

7-Eleven moves to dismiss both of Mr. Takiedine's remaining breach of contract claims, making a variety of arguments. Its overall position, however, is that Mr. Takiedine has introduced no facts to support his claims. Thus, 7-Eleven argues, there is no genuine dispute. Mr. Takiedine argues that there are numerous facts in the record to support his claims, including the opinion of his expert witness.

The Court's jurisdiction in this case is based on diversity. 28 U.S.C. § 1332. 7-Eleven notes that the Franchise Agreement, the contract at issue, provides that it "will be governed by and

3

interpreted and construed under the laws of the state in which the store is located (except for applicable conflict of law rules)." Doc. No. 25-2 ¶ 30(a). Under Pennsylvania choice of law rules, the Court honors choice of law provisions in contracts. *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994). 7-Eleven agrees. Doc. No. 158, at 4. Mr. Takiedine does not address this issue, which the Court takes to mean that he neither opposes this term of the Franchise Agreement nor 7-Eleven's choice of law analysis. Thus, the Court will apply Pennsylvania law, predicting how the Pennsylvania Supreme Court would resolve the issue. *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 225 (3d Cir. 2020).

"To state a claim for breach of contract under Pennsylvania law, a plaintiff must allege three things: (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages." *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 502 (E.D. Pa. 2008) (citation omitted); *see also Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). Under Pennsylvania contract law, "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009) (internal quotation marks omitted). "[W]hile ambiguous writings are interpreted by the finder of fact, unambiguous ones are construed by the court as a matter of law." *Id.* Thus, a motion for summary judgment is appropriate on a breach of contract claim "where a plaintiff's claim is foreclosed by the plain language of the contract." *Allegheny Design Mgmt., Inc. v. Travelers Indem. Co. of Am.*, 572 F. App'x 98, 100 (3d Cir. 2014).

The two remaining claims in this case both relate to paragraph 15(j)(1)(i) of the Franchise Agreement. That provision states that 7-Eleven will "make a commercially reasonable effort to

4

obtain the lowest cost for products and services available from such Vendor to 7-Eleven Stores on a Market Basket Basis by identifying all available discounts, allowances and other opportunities for price adjustments." Doc. No. 25-1 ¶ 15(j)(1)(i). It is this language that the parties dispute. While not ambiguous language, the term "commercially reasonable effort" does not have one set definition in this jurisdiction; rather it is a standard of reasonableness. *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv'r Commc'n Sols., Inc.*, No. 15-cv-405, 2019 WL 3022346, at *7 (E.D. Pa. May 23, 2019).

Generally speaking, "the determination of reasonableness is a factual one, requiring consideration of all the facts and circumstances." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (quoting *WellSpan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. Ct. 2005)). This is a determination based on the totality of the circumstances and includes factors such as economic interests and diligence, among others. *See In re Am. Mortg. Holdings, Inc.*, 637 F.3d 246, 259 (3d Cir. 2011) (Rendell, J., concurring). Because this is a factual question, it normally is left to a jury. *Samson Lift Techs., LLC v. Jerr-Dan Corp.*, No. 09-cv-1590, 2011 WL 13350264, at *4 (M.D. Pa. Aug. 11, 2011). In other words, summary judgment is only appropriate if there is no genuine dispute of material fact that 7-Eleven used commercially reasonable effort. *See Paramount Fin. Commc'ns, Inc.*, 2019 WL 3022346, at *7; *Rosser Int'l, Inc. v. Walter P. Moore & Assocs., Inc.*, No. 11-cv-1028, 2013 WL 3989437, at *16 (W.D. Pa. Aug. 2, 2013).

At this stage, the parties do not disagree about the meaning of the contract language or the law regarding breach of contract claims. Thus, the dispute is essentially a factual one, namely whether a jury could reasonably find that 7-Eleven did not use commercially reasonable effort. With that in mind, the Court turns to Mr. Takiedine's two remaining breach of contract claims.

I.   **There Is No Genuine Dispute that 7-Eleven Did Not Breach the Franchise Agreement in Allegedly Failing to Secure the "Lowest Cost"**

Mr. Takiedine's first claim is that 7-Eleven failed to obtain the "lowest cost for products and services" in breach of section 15(j)(1)(i) of the Franchise Agreement. Doc. No. 25, Am. Compl. ¶ 79. He claims that he was forced to payer higher costs for certain products he sold in his franchise, leading to lower profits.

7-Eleven argues that it is entitled to summary judgment on this claim for two reasons. First, 7-Eleven argues that Mr. Takiedine should be judicially estopped from pursuing this claim because he represented to the Court and to 7-Eleven that he did not plan to pursue this claim further. Doc. No. 158, at 5–6. Second, although 7-Eleven agrees that "commercially reasonable efforts" is generally a factual question for the jury, 7-Eleven argues that there are no facts in the record to suggest that 7-Eleven did *not* use commercially reasonable efforts. *Id.* at 9.

While there may be good reason for the Court to find Mr. Takiedine's "lowest cost" claim to be judicially estopped, the Court need not address that argument because it reaches the merits of 7-Eleven's argument and agrees that there is no genuine dispute of material fact.

Mr. Takiedine suggests that he is aware of the better prices that 7-Eleven *could* be getting from vendors, thus demonstrating 7-Eleven is not getting the "lowest cost." Doc. No. 167, at 17. Mr. Takiedine bases his assertions on his experience owning and operating different independent convenience stores not affiliated with 7-Eleven. *Id.*; Doc. No. 167-1, ¶¶ 11–12 (similar). For example, Mr. Takiedine testified at his deposition that he pays "73 cents a donut" from the 7-Eleven vendors, but at his own store he "buy[s] a donut that was baked that morning. . . real fancy donuts. . . for 54 cents." Doc. No. 89-1, Takiedine June 7, 2018 Dep. Tr. at 171:5–12. But, as 7-Eleven points out, Mr. Takiedine sold his own independent store in 2009. *Id.* at 32:10–16. Thus, his price calculations are based on invoices allegedly obtained from the new owner of Mr.

Takiedine's old independent store. *Id.* at 171:25–172:6.[2] Similarly, Mr. Takiedine also compared the price of a bag of 7-Select (one of 7-Eleven's proprietary brands) Nacho Cheese chips to the national brand, Doritos, to show that 7-Eleven is charging much more for similar products and thus not getting the "lowest cost." *Id.* at 172:10–19.

These comparisons do not create any genuine dispute of material fact because they are irrelevant to the question at hand. Section 15(j)(1)(i) of the Franchise Agreement does not require 7-Eleven to get the lowest possible cost on each specific product, but to "*make a commercially reasonable effort* to obtain the lowest cost." Doc. No. 25-1 ¶ 15(j)(1)(i) (emphasis added). While the Court views the evidence presented in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient." *Betts*, 621 F.3d at 252. Evidence of other episodically available lower prices may suggest 7-Eleven could have achieved lower prices, but it is pure speculation to extrapolate 7-Eleven's *efforts* from those alleged costs.[3]

Mr. Takiedine's price comparisons also fail to take account of the other part of this contract clause, which requires 7-Eleven to "obtain the lowest cost for products and services. . . *on a Market Basket Basis.*" Doc. No. 25-1 ¶ 15(j)(1)(i) (emphasis added). "Market Basket Basis" is defined to mean "a vendor's standard product mix that meets our Stores' purchase needs (excluding Proprietary Products), and is sold under terms that include a balanced comparison of payment terms and methods, in-store services, product mix, service area, frequency of delivery and delivery windows." Doc. No. 25-3, at 8. In other words, 7-Eleven is not even obligated to obtain the lowest

---

[2] Mr. Takiedine confirmed that he never gave the document upon which he based his donut comparison to his attorney. Doc. No. 89-1, Takiedine June 7, 2018 Dep. Tr at 172:7–9. As far as the Court can tell, there is a hole in Mr. Takiedine's argument on this point because this document is not in evidence. But "[a] party asserting that a fact. . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1)(A). Mr. Takiedine has not done so.

[3] An apt analogy to explain this might be to consider a road race. An observer could not look only at the results of a race to determine the effort any individual runner expended in the course of the race.

possible costs available on the market, but the lowest costs taking a number of other factors into consideration. Mr. Takiedine has not demonstrated that (or how) 7-Eleven failed to do this.

Mr. Takiedine's deposition testimony further demonstrates this critical shortcoming in his case. When asked under oath whether 7-Eleven had violated Section 15(j), Mr. Takiedine stated, "I am not privy to that information", "I don't know if they are violating, but I'm not so certain that they are complying 100 percent", and "[w]ith me not being. . . present at the time those negotiations [with vendors] were made, I cannot tell one way or the other." Doc. No. 89-2, Azmi June 8, 2018 Dep. Tr. at 87:2–3; 89:6–8; 90:6–9. Indeed, it seems that Mr. Takiedine's frustration stems, at least in part, from his inability to put his "'two cents' worth" into 7-Eleven's negotiations with vendors. Doc. No. 167-7 ¶ 9. But, in fact, none of Mr. Takiedine's personal testimony regarding 7-Eleven's commercially reasonable effort is based on personal experience. He simply has no idea whether or not 7-Eleven made "a commercially reasonable effort to obtain the lowest cost" when it was negotiating with vendors. Even if he wishes it were otherwise, Mr. Takiedine was not "in the room where it happened."[4] His speculation about what *might* have happened during the negotiations is just that, speculation; it does not create a genuine dispute so as to defeat summary judgment. *Betts*, 621 F.3d at 252.

Moreover, 7-Eleven explains that it would have every incentive to obtain the lowest possible costs for its franchisees. Doc. No. 158, at 10–12. 7-Eleven contends, based on the declarations of two senior merchandising professionals, that 7-Eleven seeks to achieve the lowest possible prices in every negotiation. *Id.* at 11. 7-Eleven notes that it has every reason to attain the lowest possible prices for its franchisees because 7-Eleven's own corporate profits are directly

---

[4] Lin Manuel Miranda, *The Room Where It Happens*, Hamilton, 2015.

linked to the profits of the individual franchisees; it makes money based on retail sales and a percentage of gross profits of individual franchisees. *Id.*; Doc. No. 159 ¶ 16.

In contrast, Mr. Takiedine argues that 7-Eleven's contracts with vendors and manufacturers demonstrate 7-Eleven's intent to control these relationships, giving it the power to drive up the cost of products and hurt franchisees like Mr. Takiedine. Doc. No. 167, at 19. Pointing to two "commissary" contracts that 7-Eleven negotiated, one with Bakery Express-Mid Atlantic, Inc. and another with Constance Food Group, Mr. Takiedine argues that the terms of these contracts demonstrate 7-Eleven's lack of commercially reasonable effort. *Id.* at 19–20. Mr. Takiedine claims that the contracts demonstrate they were not negotiated at arm's length, are longer in duration than is typical, contain no unit pricing, and allowed 7-Eleven to negotiate with suppliers to buy the bulk goods for the vendor. *Id.* at 20–22. This last piece seems to be the crux of Mr. Takiedine's argument—that 7-Eleven could use its contractual ability to negotiate with suppliers to drive up the price of the commissary products for its franchisees.

But 7-Eleven's separate contracts with certain vendors do not provide any evidence that it breached the contract at issue here, Mr. Takiedine's Franchise Agreement. Section 15(j)(1) of the Franchise Agreement states that 7-Eleven will take the steps, including the "commercially reasonably effort" at issue in this litigation, with "Recommended Vendors and manufacturers" for products and services sold in 7-Eleven Stores. Doc. No. 25-1 ¶ 15(j). In other words, 7-Eleven is also required to make commercially reasonable efforts to negotiate with manufacturers and suppliers, the contracts to which Mr. Takiedine points as support that 7-Eleven breached the Franchise Agreement. And again, the *results* of 7-Eleven's contracts with manufacturers say nothing about whether 7-Eleven made *a commercially reasonable effort* in negotiating the costs

therein. Similar to the above, this is speculation, which does not create a genuine dispute of material fact.

Mr. Takiedine's attempt to rely on his expert witness, Mr. James O'Brien, is mistaken. Mr. Takiedine's expert is not purporting to offer any opinion at all on liability, meaning he is not opining on whether 7-Eleven breached the Franchise Agreement. Nor could he. In his December 2018 report, Mr. O'Brien stated directly that he has "not been engaged to provide opinions on liability" and that "[i]n order to perform [his] analysis, [he] necessarily assumed liability on the part of the Defendant." Doc. No. 168-1, at 2. Mr. O'Brien's May 2019 report states the same. Doc. No. 91-5, at 2. Mr. O'Brien confirmed this during his April 2019 deposition, Doc. No. 77-1, O'Brien Dep. Tr. at 33:5–12, and again in his November 2021 declaration, Doc. No. 170 ¶ 25. Mr. O'Brien has specialized skill and expertise in calculating damages. Doc. No. 91-4 ¶ 72; *see also* Doc. No. 164-2 ¶¶ 16, 19. Mr. O'Brien confirmed that he is "an accounting expert" and that he "cannot offer legal opinions." Doc. No. 170 ¶ 25. In other words, he has not offered, cannot offer, and had no intention to offer an opinion as to whether 7-Eleven breached the Franchise Agreement.

*Breach* is the only issue in front of the Court on this motion for summary judgment. That Mr. Takiedine's expert may, if liability is established, be able to later testify to the damages Mr. Takiedine suffered as a result of 7-Eleven's alleged breach is irrelevant. Mr. Takiedine cannot take testimony about damages and, working backwards, use it as evidence of a breach.

This is an example of the *post hoc ergo propter hoc* logical fallacy. Under that fallacy, a party asserts that because Y happened subsequent to X, therefore, X *caused* Y. Here, Mr. Takiedine's argument is even further afield because Mr. O'Brien assumed liability to calculate damages. Thus, Mr. Takiedine is arguing that *assuming* X happened (7-Eleven's breach), Y

happened (damages), therefore, X *actually* happened *and* caused Y. Colloquially, as 7-Eleven rightly points out, this is putting the proverbial cart before the horse. Doc. No. 172, at 8.

Mr. O'Brien has since filed a declaration clarifying that he is not opining on liability but can opine on *causation* and "can have and rely upon facts that provide the nexus from liability to damages." Doc. No. 170 ¶ 26. But this facile semantics exercise also does not move the needle because, as just explained, 7-Eleven is arguing that there was no breach in the first instance. Even if Mr. O'Brien could testify to *causation*, that would not create any factual dispute about *breach*.[5]

In sum, Mr. Takiedine has introduced no facts that 7-Eleven failed to make "a commercially reasonable effort to obtain the lowest cost for products and services." Therefore, the Court grants 7-Eleven's motion for summary judgment on Mr. Takiedine's "lowest prices" claim.

## II.   There Is No Genuine Dispute that 7-Eleven Did Not Breach the Franchise Agreement in Allegedly Failing to Negotiate with Vendors for Return Privileges for 7-Eleven's Proprietary Products

Mr. Takiedine's other remaining breach of contract claim is his "return privileges" claim. Mr. Takiedine alleges that 7-Eleven breached the same clause, 15(j) of the Franchise Agreement, by failing to secure return privileges from vendors and manufacturers for 7-Eleven's privately branded products. *See* Doc. No. 25, Am. Compl. ¶¶ 25, 79. When those products went unsold, Mr. Takiedine could not return the products and had to take a loss in the form of an accounting write-off. He claims that 7-Eleven's failure to negotiate for these return privileges breached the Franchise Agreement. *See* Doc. No. 70, at 20 (The Court previously construed Mr. Takiedine's return privileges claim as a vendor negotiating practices claim).

---

[5] The Court notes that "causation" is not an independent element of a breach of contract claim like it is an independent element of, for example, a tort claim for negligence. *See Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 502 (E.D. Pa. 2008) (citation omitted). Nevertheless, causation is implicitly part of the damages element, which, in any case, still *first* requires a finding of breach.

7-Eleven makes three main arguments against this claim. First, 7-Eleven argues that Mr. Takiedine never pleaded this claim under the breach of contract theory in his amended complaint. Second, assuming he has pleaded it, 7-Eleven argues that the claim is, nevertheless, legally deficient. Third, assuming it is not legally deficient, 7-Eleven argues that, similar to the "lowest prices" claim, this claim is unsupported by any factual evidence in the record.

### A. Mr. Takiedine Has Pleaded his "Return Privileges" Claim

7-Eleven first argues that Mr. Takiedine's amended complaint contains no mention of this "return privileges" claim within his breach of contract theory. Doc. No 158, at 7. Mr. Takiedine responds that (1) his amended complaint does contain this claim and (2) it would be odd for the Court to have stayed that very claim for arbitration and then lifted the stay on that claim if it did not exist. Doc. No. 167, at 10. On this point, the Court agrees with Mr. Takiedine.

First, Mr. Takiedine's complaint contains this claim, even if perhaps not as directly as 7-Eleven may want. Paragraph 25 of Mr. Takiedine's amended complaint states: "Unlike national brand name food and products that Plaintiff may offer for sale and receive a full credit if not sold, Plaintiff must pay Defendant for proprietary products of Defendant, including '7-Select,' and if the proprietary products of Defendant are not sold, Plaintiff must take the loss in the form of a write-off." Doc. No. 25, Am. Compl. ¶ 25. Then, in Count Two for breach of contract, Mr. Takiedine explicitly incorporated all preceding paragraphs. Doc. No. 25, Am. Compl. ¶ 72. This would mean that paragraph 25 is explicitly incorporated as if set forth in the breach of contract portion of his complaint. Plus, paragraph 79 alleges that 7-Eleven is not getting the lowest prices, thus implicating § 15(j) of the Franchise Agreement. This clause of the Franchise Agreement states that 7-Eleven will "make a commercially reasonable effort to obtain the lowest cost for products *and services* available from such Vendor. . . by identifying all available discounts, *allowances and other opportunities* for price adjustments." Doc. No. 25-1 ¶ 15(j)(1)(i) (emphasis added). This

section could be read to encompass a claim for return privileges either as a "service" or as an "allowance and other opportunities." Thus, the Court rejects 7-Eleven's argument on this point.

Second, the Court explicitly lifted the former stay as to Mr. Takiedine's two remaining claims, including his "return privileges" claim. *See* Doc. No. 154, at 24; *see also* Doc. No. 70, at 21–22 (finding this claim to be under ¶ 15(j) and thus subject to the forced arbitration clause in ¶ 15(k)). In other words, it cannot have come as any surprise to 7-Eleven that Mr. Takiedine planned to pursue this claim once the Court lifted the stay.

Therefore, the Court finds that Mr. Takiedine has sufficiently pleaded this claim and rejects 7-Eleven's argument to the contrary.

### B.  Mr. Takiedine's Claim Is Not Legally Deficient

7-Eleven also argues that Mr. Takiedine's claim is legally deficient under the *other* theories in his complaint (*e.g.*, unconscionability, good faith and fair dealing, impracticability). Doc. No. 158, at 7–8. Thus, 7-Eleven claims that Mr. Takiedine may not amend his complaint in his response to his motion for summary judgment.

This argument, however, is really just a spin on the argument that he failed to properly plead a claim for breach of contract. In other words, 7-Eleven argues that, assuming Mr. Takiedine did not plead this claim properly as a breach of contract claim, it would be legally deficient under the other legal theories contained in his complaint. But the Court just determined that Mr. Takiedine *did* plead it as a breach of contract claim. Thus, this argument merits no further attention.

### C.  Mr. Takiedine's Claim is Not Based on Any Evidence

Finally, getting to the heart of the summary judgment motion, 7-Eleven argues that Mr. Takiedine's "return privileges" breach of contract claim has no basis in fact. Mr. Takiedine's argument boils down to the claim that 7-Eleven forced him to carry proprietary products in his store, which he could not return, causing him to take losses in the form of accounting write-offs.

7-Eleven argues, similar to the other claim, that none of Mr. Takiedine's evidence says anything about 7-Eleven's "commercially reasonable effort to obtain the lowest cost for products and services" from its vendors.

First, 7-Eleven claims that, even if return privileges were available from vendors, not negotiating for them would not be a breach of ¶ 15(j). Paragraph 15(j)(i) states that 7-Eleven will "make a commercially reasonable effort to obtain the lowest cost for products and services available from such Vendor to 7-Eleven Stores on a Market Basket Basis by identifying all available discounts, allowances and other opportunities for price adjustments." Doc. No. 25-1, ¶ 15(j)(1)(i). 7-Eleven's argument is that the return privileges does not fall within the language of ¶ 15(j) because they do not qualify as "discounts, allowances, [or] other opportunities for price adjustments." But this is a weak argument. Return privileges might be either an "allowance" or an "other opportunity" that could lead to a price adjustment. Indeed, the Court fails to see how the term "other opportunity," which is incredibly broad language, could be interpreted *not* to include return privileges. Further, while the franchise agreement states that 7-Eleven will attempt to negotiate with a vendor to convert any allowances into a lower price or commercial advertising, Doc. No. 25-1 ¶¶ 15(j)(1)(ii)–(iv), paragraph 15(j)(1)(v) states: "If the Vendor advises us that it will not provide such other allowances as cooperative advertising, then we will accept and use such allowances as designated by the Vendor." Doc. No. 21-5, ¶ 15(j)(1)(v). In other words, if return privileges *were* available *and* the Vendor would not convert that into advertising or a lower price, then 7-Eleven could accept "such allowances as designated by the Vendor." Thus, the Court rejects 7-Eleven's argument on this point.

Second, 7-Eleven argues that return privileges are "unheard of" for proprietary products in the industry. Doc. No. 158, at 12–13. 7-Eleven explains that, once its private label is affixed to the

product, the product cannot be returned. This is because (1) vendors would not accept a return of proprietary products because they are essentially worthless for resale purposes and (2) 7-Eleven would not want vendors reselling proprietary product labels, which would be at odds with the company's goals of private branding. *Id.* at 13.

Mr. Takiedine responds by arguing that 7-Eleven required him to carry its proprietary products in his store. This is based on his arguments related to 7-Eleven's online ordering system, Doc. No. 167, at 13–14, his allegations that 7-Eleven representatives verbally told him to buy certain products, *id.* at 14, and his allegations that 7-Eleven representatives ordered products for Mr. Takiedine without him knowing, *id.* at 14–15. Without buttressing this claim with factual information or in any way connecting it to his return privileges claim, Mr. Takiedine only references his claim that he was being forced to sell certain products in his stores. Doc. No. 167-7 ¶¶ 31–33. But the Court already considered Mr. Takiedine's arguments on this issue when he moved for leave to amend his complaint. The Court rejected it as futile because the plain terms of the Franchise Agreement permitted 7-Eleven to require that Mr. Takiedine carry and sell certain products, including 7-Eleven's proprietary "7-Select" products. Doc. No. 125, at 12–14.[6] Whether or not 7-Eleven forced Mr. Takiedine to carry certain proprietary products, that would not alter his breach of contract claim here. At risk of sounding like a broken record, that 7-Eleven may have forced Mr. Takiedine to carry certain products in his stores says nothing about 7-Eleven's *effort* in negotiating return privileges in its separate contracts with vendors and manufacturers.

---

[6] The Court previously rejected Mr. Takiedine's prior last-ditch attempt to state this claim under paragraph 15(c) of the Franchise Agreement on the basis that he failed to plead it in his amended complaint and/or was attempting to reintroduce it too late in the case. Doc. No. 125, at 8–9. Mr. Takiedine's attempt to relitigate this now by pointing to another portion of the Court's earlier opinion, Doc. No. 167, at 6 (citing Doc. No. 125, at 13), and claiming that the Court's opinion did *not* foreclose this claim is both misleading and incorrect.

Mr. Takiedine again seeks to rely on his expert witness for this claim. When 7-Eleven noted that it does not negotiate for return privileges other than for defective products, Mr. Takiedine only claims that fact is "Denied" and cites back to Mr. O'Brien, his expert witness, for support. *See, e.g.*, Doc. No. 167-7 ¶ 33. Mr. O'Brien's opinion is based, at least in part, on the contracts with manufacturers and 7-Eleven's ability to negotiate for supplies on the manufacturer's behalf. But the Court has already considered and rejected Mr. Takiedine's expert's declination and disavowal to opine on the issue of *breach*. Without recapitulating the Court's analysis above, Mr. O'Brien is jumping over and assuming breach in order to testify about causation and damages. Thus, Mr. O'Brien has not and cannot offer any opinion about *breach*. As discussed above, the *results* of 7-Eleven's contracts with various manufacturers do not speak to 7-Eleven's *effort* in negotiating them. Thus, while Mr. O'Brien's analysis of 7-Eleven's vendor contracts may be relevant to a theoretical damages calculation, it provides no evidence of *breach*.

Thus, none of Mr. Takiedine's allegations support a claim for 7-Eleven having breached § 15(j) for his "return privileges" claim. Therefore, the Court grants 7-Eleven's motion for summary judgment on this claim as well.

CONCLUSION

A claim with no supporting facts is only a hunch. But hunches are not sufficient to survive summary judgment. Because Mr. Takiedine has not introduced any genuine disputes of material fact that 7-Eleven breached its contractual obligations under the Franchise Agreement with Mr. Takiedine, the Court must grant 7-Eleven's motion for summary judgment on both of Mr. Takiedine's remaining claims. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

17